2020 IL App (1st) 182229-U

THIRD DIVISION
April 15, 2020

No. 1-18-2229

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| IN THE INTEREST OF K.M. and K.M., | ) | Appeal from the Circuit |
| | ) | Court of Cook County |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 14 JA 540 and |
| | ) | 14 JA 541 |
| v. | ) | |
| | ) | |
| FRED M., | ) | Honorable |
| | ) | Robert Balanoff |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1   Held:   Trial court judgment affirmed where its fitness and best interest findings were not against the manifest weight of the evidence.

¶ 2   Respondent, Fred M., appeals from the circuit court's findings that he is unfit to parent minors K.M. and K.M., and that it was in the best interests of K.M. and K.M. to terminate his parental rights and appoint a guardian with the right to consent to adoption.

¶ 3     K.M. is a girl born on January 22, 2011, and K.M. is a boy born on November 9, 2011.[1]

The parental rights of L.D. (mother), the biological mother of K.M. and K.M., were terminated on

October 16, 2018, and she is not involved in this appeal.[2]

¶ 4     On May 23, 2014, the State filed petitions for adjudication of wardship of K.M. and K.M.,

alleging that they were neglected based on an environment that was injurious to their welfare (705

ILCS 402/2-3(1)(b) (West 2012)), and abused based on a substantial risk of physical injury (705

ILCS 405/2-3(2)(ii) (West 2012)). The petitions alleged that mother had five other minors who

were in the custody of the Illinois Department of Children and Family Services (DCFS) with

findings of abuse, neglect and/or unfitness having been entered. Mother was not compliant with

reunification services and her whereabouts were unknown until the birth of the minors' sibling,

K.D.  At the time of K.D.'s birth, both mother and K.D. tested positive for marijuana and mother

admitted to using marijuana on a daily basis. The petition further alleged that the whereabouts of

K.M. and K.M.'s putative father, respondent, were unknown, and that paternity had not been

established. Service was made on respondent by publication.

¶ 5     Based on the facts set forth in the petitions, the court placed K.M. and K.M. under the

temporary custody of DCFS that same day.

---

[1] Both minor children at issue in this appeal share the same initials. As a consequence, when it is

necessary for this court to differentiate between the minors, we will do so by referring to them

as, respectively, "K.M. (female)" and "K.M. (male)."

[2] Because mother is not involved in this appeal, this court will include information regarding the

proceedings involving her only as necessary to provide context to the proceedings involving

respondent.

¶ 6 On May 29, 2014, the court returned K.M. and K.M. to the custody of mother pursuant to an order of protection (705 ILCS 405/2-20 (West 2012)) and a supplemental order of protection.

¶ 7 On August 21, 2014, the court entered adjudication orders and reserved its findings on the issue of whether K.M. and K.M. were neglected based on an environment injurious to their welfare and abused because they were at a substantial risk of physical injury. Attached to the minors' adjudication orders were written stipulations between the State, the Guardian ad Litem (GAL), and mother. Specifically, the parties stipulated that a DCFS investigator was assigned to investigate K.M., K.M., and K.D. in May 2014, when K.D. and mother tested positive for marijuana at the time of K.D.'s birth. Mother admitted to using marijuana. At the time of the K.D.'s birth, mother had five other minors in DCFS custody with findings of abuse, neglect, and/or unfitness having been entered. Respondent was named as K.M. and K.M.'s putative father, but paternity had not been established and his whereabouts were unknown. Respondent was not the putative father of K.D.

¶ 8 The stipulation further included that Lawrence Hall Youth Services (Lawrence Hall) monitored the family case since 2009, and that mother was non-compliant with "reunification services including individual therapy, domestic violence counseling, parenting classes, substance abuse treatment including inpatient substance abuse treatment, and random urine screens." Mother failed to maintain contact with the assigned caseworker or the agency, and the whereabouts of mother, K.M., and K.M. were unknown to the agency until the birth of K.D.

¶ 9 On December 10, 2014, the State filed an emergency motion "to violate and vacate" the order of protection alleging that mother's whereabouts were unknown and that she failed to comply with the terms and conditions of the order of protection. The same day, the court granted the State's motion, vacated the order of protection and the supplemental order of protection, and placed K.M.,

K.M. and K.D. in the temporary custody of DCFS.

¶ 10    On January 5, 2015, the court entered adjudication orders finding that K.M. and K.M. were neglected based on an environment injurious to their welfare. The orders listed mother's violation of the order of protection, her five other children in DCFS custody, her and K.D.'s positive test results for marijuana at the time of K.D.'s birth, and her history of non-compliance with reunification services, as bases for the finding.

¶ 11    On April 21, 2015, the court entered dispositional orders for K.M. and K.M., finding it to be in their best interests to be adjudicated wards of the court. The court further found both mother and respondent were unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minors and that respondent was unwilling to care for, protect, train, or discipline the minors.

¶ 12    Also on April 21, 2015, the court entered a permanency order, finding a permanency goal of return home within 12 months to be appropriate for K.M. and K.M. In that order, the court found that both mother and respondent had not made substantial progress toward the return home of the minors, and that both mother and respondent "need[ed] to engage in services for reunification."

¶ 13    On September 14, 2016, the court changed the minors' permanency goal from return home to substitute care pending court determination on termination of parental rights. The court explained that the minors had been placed in "a pre-adoptive home that [wa]s meeting their needs." Mother was inconsistent in both visitation and services, and respondent "ha[d] not come forward."

¶ 14    On March 22, 2017, respondent appeared in court and findings of paternity regarding K.M. and K.M. were entered. The same day, the court entered a permanency order finding the appropriate goal to be substitute care pending court determination on termination of parental rights, finding both parents had "not made progress in services."

¶ 15    Also on March 22, 2017, the court entered orders denying visitation between the minors and respondent "at present," and requiring visitation between the minors and respondent to be "limited" because the "children have no relationship with their biological father and are in IPS [(Intensive Placement Stabilization)] services."

¶ 16    On June 23, 2017, the State filed Supplemental Petitions for the Appointment of a Guardian with the Right to Consent to Adoption for K.M. and K.M. The petitions alleged in regard to both K.M. and K.M., that both mother and respondent were unfit on the following four grounds:

"b. They have failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare, in violation of 750 ILCS 50/1 D(b) and 705 ILCS 405/2-29.

c. They have deserted the child for more than three months next preceding the commencement of these termination proceedings, in violation of 750 ILCS 50/1 D(c) and 705 ILCS 405 2-29.

m. They have failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from them and/or have failed to make reasonable progress toward the return of the child to them within 9 months after the adjudication of neglect or abuse under the Juvenile Court Act, or after an adjudication of dependency under the Juvenile Court Act, and/or within any 9 month period after said finding, in violation of 750 ILCS 50/1 D (m) and 705 ILCS 405/2-29. [and]

n. They evidenced intent to forego parental rights as manifested by a failure for a period of 12 months to (i) visit the child, (ii) to communicate with the child or agency, although able to do so and not prevented from doing so by an agency or by

5

court order, and/or (iii) to maintain contact with or plan for the future of the child, although physically able to do so, in violation of 750 ILCS 50/1 D (n) and 705 ILCS 405/2-29."

¶ 17    The petitions further alleged that adoption was in K.M. and K.M.'s best interests as the minors had been residing with their foster parent since August 12, 2015, and the foster parent wished to adopt them. Accordingly, the State requested that the court find respondent and mother unfit, terminate their parental rights, and appoint a guardian with the right to consent to adoption.

¶ 18    On June 26, 2017, the court entered a subsequent visitation order, again ordering that visits between the minors and respondent be limited because "services [we]re just starting and Minors have no relationship with their Father." The visitation order granted respondent day visits supervised by a DCFS or private agency caseworker, but required that he "be engaged in all of his services before the visits begin."

¶ 19    On October 6, 2017, the court entered another visitation order providing for limited visitation with K.M. and K.M. The order stated that respondent "just recently came forward and started to engage in services and has not seen the children in over three years." The court ordered that supervised day visits were allowed "to take place at the agency until the children's Therapists deem it safe to move visits to another location." The court further ordered that the visits were limited to respondent, K.M., and K.M., and that "no other persons [we]re to be involved with the visits other than the agency caseworker."

¶ 20    On April 6, 2018, the court entered a permanency order finding the appropriate goal to be substitute care pending court determination of termination of parental rights. The court noted that mother's whereabouts were unknown, respondent had "only visited twice since" December 2017, and the children were "bonded w[ith]" their foster parent.

¶ 21    On October 16, 2018, the court held a fitness hearing. The State, respondent, respondent's counsel, and the GAL were all present in court. Mother was not present.

¶ 22    Kelly Spencer, a caseworker with Lawrence Hall, testified that Lawrence Hall had been servicing the family since 2009, before K.M. and K.M. were born. Ms. Spencer was assigned to the family's case on January 19, 2018, at which time she reviewed their file. Ms. Spencer confirmed that respondent was father to both K.M. and K.M. The file did not contain any visitation logs documenting that respondent visited K.M. and/or K.M. during 2014, 2015, or 2016, or any documentation indicating that respondent completed any services during 2014, 2015, or 2016. Father came forward in March 2017, and was initially assessed for services at that time.

¶ 23    In August 2017, respondent completed an eight-week parenting program. He was recommended for individual therapy, and the file contained a report from a therapist that indicated certain dates on which father had talked to the therapist, but it did not contain a discharge summary or otherwise indicate that therapy had been completed.

¶ 24    Ms. Spencer testified that before respondent came forward, the goal had already been changed to substitute care pending court determination on termination of parental rights. Respondent was allowed monthly supervised visitation with K.M. and K.M., which began in October 2017. The visits were supervised by either a family support specialist from Lawrence Hall or the foster mother. Ms. Spencer stated that the foster mother and respondent had a good relationship with each other, there were no concerns regarding the visits, and K.M. and K.M. enjoyed visitation with respondent. From October 2017 until the hearing date in October 2018, Lawrence Hall supervised approximately three visits between K.M., K.M., and respondent. Respondent was required to confirm with Lawrence Hall prior to the scheduled visitation, otherwise the visits would be canceled. Ms. Spencer testified that respondent failed to confirm

some of the scheduled visits, and as a consequence, some of respondent's scheduled visits with the minors were canceled. Ms. Spencer further stated that respondent did not send any cards, gifts, or letters to K.M. or K.M. until January 2018.

¶ 25    On cross-examination by respondent's counsel, Ms. Spencer testified that the documentation regarding respondent's individual therapy dated back to 2017, which included dates that respondent engaged in therapy, but it did not include a complete therapy report. Respondent had also completed a Juvenile Court Assessment Program (JCAP) assessment. The file indicated that a substance abuse assessment had also been completed for respondent, but supporting documentation was not contained in the file.

¶ 26    The State then called M.R.,[3] who testified that she is K.M. and K.M.'s foster mother. K.M. and K.M. had lived with her for three years. M.R. testified that initially, Lawrence Hall supervised respondent's visits with K.M. and K.M., but M.R. began supervising the visits in the beginning of 2018. M.R. supervised approximately five visits which went "good, real good." M.R. did not have any concerns with the visits, and testified that if respondent's parental rights were terminated, she would still allow K.M. and K.M. to maintain contact with him.

¶ 27    M.R. testified that the first time respondent provided any gifts to K.M. and K.M. was in January 2018, and that he had not sent any cards, gifts, or letters to them before that time. Prior to Fall 2017, respondent had never called M.R. to inquire about K.M. and K.M.'s welfare. However, M.R. had since provided respondent with her telephone number for him to keep in touch with K.M. and K.M.

_____

[3] For purposes of anonymity, we will refer to the minor's foster mother by her first and last initials.

¶ 28    The State rested, and the GAL did not present any evidence.

¶ 29    Respondent testified that he was K.M. and K.M.'s father, and that he had learned that he was their father in 2017 "through court." Respondent testified that he was present at the births of both minors, but he did not sign either birth certificate. He testified that he maintained contact with mother during both pregnancies, until "she left him" in 2011. He subsequently communicated with her through Facebook, and mother told him that she was "moving out of town." The last contact respondent had with K.M., K.M., and mother prior to coming into court was in 2014, and then mother "stopped letting [him] talk to them."

¶ 30    Respondent testified that he learned of K.M. and K.M.'s juvenile court matter in 2016 after his sister received a letter. Respondent began coming into court in 2017. Respondent then began engaging in services, including "[d]rug abuse [treatment], parenting classes, and *** individual therapy." Respondent completed parenting classes and a substance abuse assessment, and informed the minors' caseworker of his completion of those services. Respondent also informed the caseworker about attending individual therapy. Respondent stated that he found the services on his own, because the goal had already been changed to termination of parental rights.

¶ 31    Respondent testified that he was not allowed to visit with K.M. and K.M. until he was engaged in all of his recommended services. Once he was engaged in all of the services, the caseworker helped him set up visits with his children. Respondent testified that M.R. was also helpful in setting up visits. He had a good relationship with her, and she provided him with a phone number where he could reach her. Respondent testified that he had a good relationship with K.M. and K.M. He shared a bond with them, loved them, and wished to have them returned to him. Respondent wanted custody of his children, and did not want his parental rights terminated.

¶ 32    On cross-examination, respondent testified that he visited K.M. and K.M. "maybe five"

times between 2011 and 2014. Mother told him that she and the minors had moved out of state at the end of 2015. Respondent testified that the last time he saw K.M. and K.M. was in 2014, but he did not remember when. During 2014, 2015, and 2016, respondent lived in Chicago. Respondent testified that he stopped attending therapy because his "therapist said there's no need to be coming back and forth" and they were not having any progress.

¶ 33    The State admitted several documents into evidence at the hearing. These documents included an integrated assessment of the minors' family dated January 4, 2016, identifying the problems that contributed to the abuse and neglect of the minors, and the reunification services to best remedy those issues. Respondent was not named as K.M. and K.M.'s father; their father was listed as unknown. The State's exhibits also included seven service plans dated March 25, 2015, September 9, 2015, March 26, 2016, October 14, 2016, March 23, 2017, September 20, 2017, and March 3, 2018. The service plans generally indicated that respondent was initially identified as the putative father of K.M. and K.M., but that his whereabouts were unknown, despite "diligent search[es]" by the caseworker. The service plans also indicated that in September 2016, the goal had been changed to substitute care pending court determination on termination of parental rights, after respondent had not made substantial progress toward K.M. and K.M.'s return home. Subsequent service plans indicated that respondent had come forward and was engaged in services. The March 3, 2018 service plan specifically stated that respondent had one supervised visit per month with K.M. and K.M., and that the minors enjoyed those visits. However, respondent missed some scheduled visits due to his failure to confirm those visits the day prior. The service plan indicated that respondent was engaged in individual counseling and had completed parenting classes.

¶ 34    Respondent admitted six documents into evidence at the hearing, including an August 28,

2017, certificate of completion for an 8-week parenting workshop, and a document dated September 8, 2017, titled "Final Report," which was performed by and verified by therapist, Sylvia White, on December 7, 2017. The document indicated that Ms. White spoke with respondent regarding abuse of heroin and cocaine. It further indicated that respondent denied using any substances, including marijuana, and that he was reevaluated on October 3, November 7, and December 5, 2017. Respondent also admitted documents indicating services for "30 min. *** Behavioral Health." Finally, respondent admitted a summary from his therapist, indicating that respondent discussed his children and wanted custody of them. The summary further stated that respondent was "anxious" and was "not sure which way the judge is going."

¶ 35    Based on the above evidence, the court found that the State had met its burden of proving respondent's unfitness by clear and convincing evidence "under [Grounds] B, M, and N for all time periods alleged." The court specifically acknowledged that respondent came forward in 2017, had his first visit in October 2017, and completed JCAP and parenting classes. It found, however, that respondent did not complete individual therapy, and that he had "missed some of" his scheduled monthly visits. The court further stated, "[t]he fact is he was away from these children's lives for three years while they were in our system, which, of course, is a problem."

¶ 36    The parties then proceeded to the best interests hearing. Ms. Spencer testified again that she was the caseworker assigned to K.M. and K.M.'s case. Ms. Spencer stated that K.M. and K.M. had been placed together with M.R., a non-relative foster mother, for approximately three-and-a-half years. Ms. Spencer testified that four other adopted children lived in the foster home as well. Ms. Spencer visited the minors in the foster home on a monthly basis and found the home to be safe and appropriate. There were no signs of abuse, neglect, or corporal punishment, nor had there been any unusual incidents reported regarding M.R.'s care of the minors.

¶ 37    Ms. Spencer further testified that both K.M. and K.M. had special needs, specifically, sexualized behavior, and they attended weekly therapy sessions to address their issues. M.R. transported the minors to therapy and consistently made all appointments. Ms. Spencer stated that M.R. participated in K.M. and K.M.'s education, and went to meetings at the school. Ms. Spencer testified that K.M. and K.M. were bonded to M.R. and they had "good open communication" with one another. The minors also had a good bond with the four other children in the foster home, and were bonded with M.R.'s extended family.

¶ 38    Ms. Spencer testified that both K.M. and K.M. liked living with M.R. Ms. Spencer discussed with both minors the possibility of M.R. adopting them and K.M. (female) responded with "that makes me feel good" and K.M. (male) "gave [her] the thumbs up." Ms. Spencer did not have any concerns regarding M.R.'s ability to care for K.M. and K.M.

¶ 39    M.R. testified that K.M. and K.M. had been living with her for three-and-a-half years. The minors also lived with her four adopted children. They got along with each other, and had a "regular sibling relationship." M.R. described activities that they participated in, including going to their family farm in Indiana, going to visit family, and going to the park. M.R. stated that she wanted to adopt K.M. and K.M., and if she were allowed to do so, she would permit continued visitation between the minors and respondent.

¶ 40    After hearing arguments from the parties, the court found that it was in the best interests of K.M. and K.M. that respondent's parental rights be terminated, and that a guardian be appointed with the right to consent to adoption. The court entered a Termination Hearing Order terminating respondent's parental rights, and a Permanency Order with the permanency goal being adoption. Respondent filed a timely notice of appeal on October 18, 2018.

¶ 41    The issues before this court on appeal are whether the trial court's fitness and best interest

12

findings were against the manifest weight of the evidence.

¶ 42    As an initial matter, we note that respondent's counsel previously filed three motions in this court to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), which sets forth the procedures to be followed in order for appellate counsel, appointed to represent a defendant, to properly withdraw when counsel concludes the appeal is frivolous. See *Matter of Brazelton*, 237 Ill. App. 3d 269, 270 (1992). This court denied the first two motions without prejudice to counsel's refiling, finding that counsel had not adequately explained how the evidence in the record supported the trial court's decision. After counsel filed a third, yet again, inadequate motion to withdraw, this court denied the motion with prejudice, and ordered counsel to brief the issues of whether the trial court's fitness and best interest findings were against the manifest weight of the evidence.

¶ 43    In respondent's appellate brief, counsel argues that the trial court's findings were not against the manifest weight of the evidence, and that the trial court's judgment should be affirmed. By not arguing any error in the trial court's judgment, any possible appellate issue is forfeited. See Ill. S. Ct. R. 341(h)(7) (West 2016) ("Points not argued are forfeited"); *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126, ¶ 56; *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 n. 2 (2006) (where plaintiffs did not raise an issue in their appellate brief, they forfeited the issue for review); *In re Mark W.*, 383 Ill. App. 3d 572, 587 (2008) ("Our supreme court has consistently held that a party's failure to raise an issue may be deemed a forfeiture *** or waiver *** of that issue"). Supreme Court Rule 341(h)(7) requires the appellant to present reasoned argument and citation to legal authority and to specific portions of the record in support of a claim of error. Ill. S. Ct. R. 341(h)(7); see also *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 20 (Appellate courts "are entitled to have the issues clearly defined, [and] to be cited pertinent

authorities." (internal quotation marks and citation omitted)). Because respondent has not presented reasoned argument and citations to authority in support of his claims of error, let alone made any claim of error at all, he has forfeited appellate review.

¶ 44     Forfeiture aside, this court has reviewed the record and the judgment of the trial court, and we find no error in the trial court's judgment. See *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30, ("forfeiture is a limitation on the parties, not the reviewing court, and we will relax the forfeiture rule to address a plain error affecting the fundamental fairness of a proceeding, maintain a uniform body of precedent, and reach a just result.").

¶ 45     " 'In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act.' " *In re M.I.*, 2016 IL 120232, ¶ 19, quoting *In re E.B.*, 231 Ill. 2d 459, 463 (2008). The Juvenile Court Act sets forth a two-step process for the involuntary termination of parental rights. See 705 ILCS 405/2-29(2) (West 2016). "First, the court must find, by clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act[.] *** Second, once a finding of parental unfitness is made under section 1(D) of the Adoption Act, the court considers the best interest of the child in determining whether parental rights should be terminated." (Internal citations and quotation marks omitted) *In re M.I.*, 2016 IL 120232, ¶ 20. Because the trial court's opportunity to view and evaluate the parties is superior to that of a reviewing court, a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence, *i.e.*, unless "the opposite conclusion is clearly apparent." *Id*.

¶ 46     When evaluating parental fitness, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2016). Evidence of unfitness based on any ground enumerated in section 1(D)

of the Adoption Act is enough to support a finding of unfitness, even where the evidence may not be sufficient to support another ground. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). This court may affirm on any basis in the record, and we need not review all the grounds for a finding of unfitness if we uphold the trial court's findings as to one ground of unfitness. See *In re D.H.*, 323 Ill. App. 3d 1, 9 (2001).

¶ 47    In this case, the trial court found respondent unfit under subsections 1D(b), (m), and (n) of the Adoption Act (750 ILCS 50/1D(b), (m), and (n)), determining, respectively, that he failed to maintain a reasonable degree of interest, concern, or responsibility as to K.M. and K.M.'s welfare; that, during each of three separate time periods, respondent failed to make reasonable efforts and progress toward K.M. and K.M.'s return; and that he evidenced intent to forego his parental rights. Because we find the trial court's determination under the first subsection dispositive, we will begin our analysis there.

¶ 48    Under the Adoption Act, a parent will be found unfit if he fails "to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1 (D)(b) (West 2018). Because the language of subsection (b) is in the disjunctive, any of the three elements—interest, concern or responsibility—may be considered on its own as a basis for unfitness. *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008). In examining allegations under subsection (b), a trial court must focus on a parent's reasonable efforts rather than success, and must consider any circumstances that may have made it difficult to visit, communicate with, or otherwise show interest in the child. *Id.*

¶ 49    A parent is not fit simply because he has demonstrated some interest in or affection for his children; the interest, concern, or responsibility must be objectively reasonable. *In re M.J.,* 314 Ill. App. 3d 649, 657 (2000). Factors to be considered in an analysis of these elements include a

parent's efforts to visit and maintain contact with the child, as well as other evidence of interest, such as inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A court must examine a parent's conduct in the context in which it occurs, including any difficulty in obtaining transportation to the child's residence, the parent's poverty, conduct of others that hinders visitation, and the motivation underlying the failure to visit. *In re Adoption of Syck,* 138 Ill. 2d 255, 279 (1990).

¶ 50     "If personal visits were somehow impractical, courts consider whether a reasonable degree of concern was demonstrated through letters, telephone calls, and gifts to the child, taking into account the frequency and nature of those contacts." *In re Daphnie,* 368 Ill. App. 3d at 1064. "Noncompliance with an imposed service plan" and "infrequent or irregular visitation with the child" have both been held to be sufficient evidence warranting a finding of unfitness under subsection (b). *In re Jaron Z.,* 348 Ill. App. 3d at 259.

¶ 51     Based on our review of the record, the court's finding that respondent was unfit under subsection (b) was not against the manifest weight of the evidence. At the unfitness hearing, Ms. Spencer testified that there was not any record of respondent visiting K.M. and K.M. at any point during 2014, 2015, or 2016, nor was there any documentation that respondent engaged in any services during the same time period. It was not until March 2017 that respondent came forward, requested visitation, and was assessed for services. Moreover, until January 2018, respondent had not sent any cards, gifts, or letters to K.M. or K.M. Ms. Spencer's testimony was corroborated by the service plans that were admitted into evidence, which also indicated that respondent was identified as K.M. and K.M.'s father; however, his whereabouts were unknown until 2017.

¶ 52     Respondent's testimony also revealed his lack of interest, concern, or responsibility for K.M. and K.M. He testified that he was present at both their births, and maintained contact with

mother via Facebook until 2014. Respondent testified that he visited K.M. and K.M. "maybe five" times from 2012 through 2014, until mother "stopped letting [him] talk to them" and mother told him they were "moving out of town." Subsequently, in 2016, he learned that K.M. and K.M. were involved in the court proceedings. Respondent appeared in court and began participating in services in 2017, after the permanency goal for K.M. and K.M. had been changed to substitute care pending court determination on termination of parental rights.

¶ 53    Instead of displaying interest, concern or responsibility as to K.M. and K.M.'s welfare in 2014, after mother "stopped letting" respondent talk to the minors, respondent did nothing until he received notice about the court proceedings. Moreover, once respondent became involved in the proceedings, he failed to complete services and stopped attending therapy. Respondent also sometimes failed to comply with the requirement to confirm visitation sessions, and consequently, some of his visitation sessions with K.M. and K.M. were canceled.

¶ 54    Under these facts, we do not find the trial court's finding of unfitness under subsection (b) to be against the manifest weight of the evidence. See *In re Jaron Z.,* 348 Ill. App. 3d at 259.

¶ 55    Although respondent was also found unfit on two other grounds, as previously discussed, "any one ground, properly proven, is sufficient to enter a finding of unfitness." *In re C.W.*, 199 Ill. 2d at 210. Accordingly, this court need not review the remaining two unfitness grounds found by the trial court. See *In re D.H.*, 323 Ill. App. 3d at 9.

¶ 56    We next turn to the trial court's determination that it was in K.M. and K.M.'s best interests that respondent's parental rights be terminated. Once the trial court determines a parent to be unfit, the next stage is to determine whether it is in the best interest of the minor to terminate parental rights. *In re Jaron Z.*, 348 Ill. App. 3d at 261. The State must prove by a preponderance of the evidence that termination is in the best interest of the minor, and the trial court's finding will not

be overturned unless it is against the manifest weight of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367 (2004); *In re Jaron Z.*, 348 Ill. App. 3d at 261-62.

¶ 57     In making a best interest determination, the court must consider the following factors, in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 58     In light of this record, the court's determination that it was in K.M. and K.M.'s best interests to have respondent's parental rights terminated, and to appoint a guardian with the right to consent to their adoption, was not against the manifest weight of the evidence. The record shows that the factors outlined above overwhelmingly supported such a conclusion. Specifically, the record shows that K.M. (female) and K.M. (male) were, respectively, 7 and 6 years old and had been with the same foster family for approximately three-and-a-half years, since August of 2015. Ms. Spencer, the current caseworker, testified that she visited the foster home on a monthly basis and it was always safe and appropriate. She did not observe any signs of abuse, neglect, or corporal punishment, nor had there been any unusual incidents regarding M.R.'s care of the minors. M.R. ensured that the minors consistently attended therapy for their special needs and was involved in their education. K.M. and K.M. were bonded to M.R., as well as to M.R.'s four children and extended family. Moreover, both K.M. and K.M. expressed positive reactions when asked if they wanted to be adopted by M.R., and M.R. likewise testified that she wanted to adopt K.M. and K.M. Although respondent also expressed a desire that the minors be returned to him, the evidence

demonstrated that he was not involved in K.M. and K.M.'s lives for over three years. Moreover, after returning, he engaged in, at most, monthly visitation sessions, some of which he failed to confirm and attend. In these circumstances, we do not find the court's best interest findings to be against the manifest weight of the evidence.

¶ 59    For the foregoing reasons, we affirm the judgment of the trial court.[4]

¶ 60    Affirmed.

---

[4] We note that oral argument was not requested in this case.