NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210651-U

NOS. 4-21-0651, 4-21-0652, 4-21-0653 cons.

FILED
June 14, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* P.J., R.J., and A.J., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Coles County |
| Petitioner-Appellee, | ) | Nos. 19JA16 |
| v. | ) | 19JA17 |
| Cecil J., | ) | 19JA18 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Jonathan T. Braden, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, holding the trial court did not err in finding
respondent an unfit person and terminating his parental rights.

¶ 2    In March 2019, the State filed a petition for adjudication of neglect or abuse with

respect to P.J., R.J., and A.J., the minor children of respondent, Cecil J., and Heidi W., who is

not a party to this appeal. In May 2019, the trial court adjudicated the minors abused and

neglected, made them wards of the court, and placed custody and guardianship with the Illinois

Department of Children and Family Services (DCFS). The State filed a motion to terminate

respondent's parental rights in June 2020. Following a hearing on the State's motion in February

2021, the court found respondent an "unfit person" within the meaning of section 1(D) of the

Adoption Act (750 ILCS 50/1(D) (West 2018)). The court then found it was in the minors' best

interests to terminate respondent's parental rights.

¶ 3        In February 2022, respondent moved to consolidate the three cases into this one appeal, and we granted the motion. On appeal, respondent argues the trial court erred in terminating his parental rights; specifically, he alleges the trial court's unfitness finding stands against the manifest weight of the evidence because it was "impossible for him" to make reasonable progress toward the return of the children to his home. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        On March 18, 2019, the State filed a petition for adjudication of abuse and neglect with respect to R.J. (born January 23, 2009), P.J. (born June 1, 2011), and A.J. (born September 19, 2015), alleging the elder two children had been physically abused as evidenced by abrasions, welts, and bruises about their bodies, and all three children were exposed to drugs in the home. The State's petition further alleged respondent (Cecil J. or Father) to be the children's father and noted he lived in Portland, Oregon. After a shelter care hearing, the trial court found probable cause existed that the minor children were "abused and neglected by the utilization of extraordinary or excessive corporal punishment" and "by the drug use of the respondent mother and based upon [her] incarceration." Finding immediate and urgent necessity based upon the physical abuse and neglect, the trial court placed temporary custody and guardianship of the children with DCFS.

¶ 6                           A. Adjudicatory Proceedings

¶ 7        At the May 17, 2019, adjudicatory hearing, the trial court confirmed Father had been served with a summons and a copy of the petition. Father had been scheduled to appear at the hearing, but an "unexpected family emergency" in Oregon prevented him from travelling to Illinois. Despite Father's absence, the hearing proceeded, and the children's mother stipulated to

three allegations in DCFS's petition. The trial court issued an adjudicatory order finding the minors abused and neglected. The court specifically noted the respondent mother "utilizes physically abusive punishment upon [the children], [she] possesses illegal drugs within the home, and [she] entrusts the [children] with individuals who physically abuse the [children]."

¶ 8        Following a thorough interview with Father in June 2019, One Hope United (an organization contracted by DCFS) issued a dispositional report finding Father "presents with suggestions of mental illness, substance abuse, and chronic instability." The report found the following "recommendations should be substantially achieved prior to reunification/permanency goal achievement": undergo a substance abuse evaluation and complete any recommended services, undergo a psychiatric evaluation and mental health case management "to develop plans for stable income, housing, supports, etc. that will improve his ability to provide for his children's needs," "complete an interactive parenting capacity assessment to determine his strengths and needs as a parent, which should then be used to guide any parenting services," and domestic violence perpetrator services.

¶ 9        On August 16, 2019, the trial court held a dispositional hearing and Father appeared. The trial court first confirmed he understood the allegations in the petition for adjudication and neglect. The trial court appointed Father counsel because he stated he could not afford to hire an attorney because his sole source of income was "SSI" (Social Security Supplemental Income), which totaled "about" $800 per month. Father, through counsel, informed the court he did "not intend to stay in Illinois" and "[h]e was hoping to have the children placed with him immediately." Father went on to note he did not agree with what DCFS was doing and said, "I have my own plan." He then asked: "Can this case be transferred to the State of Oregon? I deal with the State of Oregon Department of DCFS instead of dealing with

the State of Illinois. Is that a problem? How do I do that?" The trial court recommended Father consult with his attorney who was there in the courtroom with him.

¶ 10        On February 21, 2020, the parties appeared (except Father) for a permanency hearing. Father's counsel requested a contested hearing because "[w]e disagree with the recommended findings of negative efforts and progress," and the report did not contain a recommended goal.

¶ 11        The trial court held a contested permanency hearing on June 19, 2020. Mindy Waddell, of One Hope United, testified she was the case manager assigned to this case. She confirmed Father had a copy of the service plan. Waddell testified Father had not completed any required services, although he began domestic violence services but stopped them due, he said, to cost. On cross-examination, Father's counsel presented Waddell with a document indicating Father had completed a substance abuse assessment, but Waddell indicated she had never seen the document before the hearing. She stated she could not verify who completed the document or whether it was authentic. The trial court determined Father made reasonable efforts, but he had not made reasonable progress toward returning the children to his care. Since the State did not argue otherwise, the trial court presumed the certificate indicating Father completed substance abuse treatment was authentic and credited him with completing those services. However, the trial court determined Father had not completed domestic violence services, he had not undergone a psychiatric consultation, and he had not demonstrated his parenting ability. The trial court changed the goal of the case to substitute care pending determination of termination of parental rights.

¶ 12                B. Termination of Respondent's Parental Rights

¶ 13        Within a few days, on June 23, 2020, the State filed a motion seeking a finding of

- 4 -

unfitness and termination of Father's parental rights. The State alleged Father was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified two grounds of unfitness as to Father: (1) he had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children from the home during any nine month period following the adjudication order, specifically May 17, 2019, to February 17, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)) and (2) he had failed to make reasonable progress toward the return of the children to him within any nine-month period following adjudication of abuse and neglect, specifically the nine-month period between May 17, 2019, to February 17, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State further contended termination of Father's parental rights was in the children's best interests and asked for custody and guardianship to remain with DCFS, giving them the authority to consent to the minors' adoption.

¶ 14                                    C. Fitness

¶ 15        In February 2021, the trial court held a fitness hearing. At his own request, Father remained in Oregon and appeared via Zoom while the witnesses and attorneys (including Father's counsel) appeared in person. The State called one witness: foster care case manager Mindy Waddell of One Hope United. Waddell testified she had been the case manager since the beginning of the case and recalled the children came into care due to physical abuse by their mother. The State then asked the trial court to take judicial notice of its own records, namely Coles County case No. 19-CF-116, which the court did. Waddell testified the children and their mother "fled Oregon due to a DHS [case], which would be equivalent of the DCFS in Oregon, for abuse against [R.J.]" Waddell did not know what contact the children had with Father prior to them coming into care in Illinois.

¶ 16    Waddell testified there was an integrated assessment done concerning Father. Based on the assessment, DCFS developed a service plan requiring Father to complete the following services: a parenting capacity assessment, perpetrator domestic violence services, substance abuse treatment, and a mental health assessment. Waddell noted she received confirmation from service providers in Oregon that Father completed substance abuse treatment and underwent a mental health assessment. Waddell noted she received documentation on July 13, 2020, that Father completed substance abuse treatment, but she had no verification Father engaged in or completed treatment during the period of May 17, 2019, to February 17, 2020. Similarly, Waddell testified she did not receive verification that Father completed a mental health assessment until September 2020.

¶ 17    Waddell next testified Father had not completed domestic violence services or a parenting assessment. She stated Father had scheduled a parenting assessment with an Oregon doctor but cancelled and rescheduled the appointment four times and the doctor was no longer willing to take the appointment. Waddell confirmed Father did not complete a parenting assessment between the relevant time period, May 17, 2019, to February 17, 2020. As for domestic violence services, Waddell testified she received an update on January 11, 2021, which indicated Father "had completed 18 of the 36-week program, and that he struggles with his journals." She noted Father previously attempted to complete a domestic violence program, but he had to undergo another assessment because "he was in the 90th percentile of dishonesty in the assessment." Waddell said Father did not successfully complete any domestic violence treatment between May 17, 2019, and February 17, 2020.

¶ 18    Waddell testified she and Father maintained regular contact, usually via email, from August 2019 to February 2020. She noted Father had weekly phone calls with the children

since May 2020. The calls usually lasted five minutes or less.

¶ 19      On cross-examination by Father's counsel, Waddell stated she did not know if Father could afford to pay for services in Oregon. She testified Father could have completed some required assessments in Illinois free of cost. When asked about the Interstate Compact and if she used it in this case, Waddell testified she did not initiate it because she was "not really familiar with the Interstate Compact that much." Waddell acknowledged she received correspondence from a Washington County, Oregon, resource worker who told her that Father was "trying to find a way to access services through Oregon DHS." Waddell testified she would not be surprised to learn Father completed more domestic violence classes because the verification noting he completed 18 classes was dated January 11, 2021, almost six weeks before the hearing.

¶ 20      On cross-examination by the court-appointed special advocate's (CASA) counsel, Waddell stated Father "kept wanting to have [the children] placed with him" during the period of May 17, 2019, to February 17, 2020. Waddell testified One Hope United and DCFS considered placing the children with Father but did not pursue that course of action or invoke the Interstate Compact after they received certain documentation from Oregon DHS. She reiterated that Father previously started a different domestic violence program sometime after May 17, 2019, but "he had stopped going by" February 2020 and "[h]e withdrew himself from the program." Waddell again testified Father had not yet completed domestic violence services or a parenting assessment. She stated that "[o]n a few occasions *** [u]sually a week before court" Father would inform her he could not afford to pay for a parenting assessment. Waddell explained she tried to secure a free parenting assessment for Father in Illinois, "[a]nd when I asked him if he would come to Illinois for that, he stated he would rather pay out of pocket in Oregon." Finally,

Waddell testified the COVID-19 pandemic did not prevent Father from engaging in services for the period of May 17, 2019, to February 17, 2020, and it did not prevent him from travelling to Illinois in June 2020 and afterwards.

¶ 21 Neither Father nor the CASA presented any evidence.

¶ 22 Despite the arguments of counsel as to whether Father was unfit, the CASA offered perhaps the most succinct closing argument when stating: "I believe that the evidence is clear and convincing he did not complete any of these services between May of 17, 2019, and February 17th of 2020."

¶ 23 The trial court ruled from the bench, reviewing why the children came into care 710 days ago. Though the trial court focused its analysis on the relevant nine-month period of May 17, 2019, to February 17, 2020, it acknowledged Father completed a mental health assessment and substance abuse treatment after February 2020. But the trial court stated: "[t]he most concerning issue to the Court is the domestic violence services, because these children were taken into care with bruising all over them and abuse perpetrated by [their mother] and [her] paramour." The trial court reasoned that since the children were "victims of domestic violence," then completion of those services proved paramount. The trial court noted: "In this case, there's recommendations in place that [Father] complete 36 weeks of [domestic violence services]. He's completed half of it, and the Court can speculate that since the report, since January of 2021, there may have been some more services completed. But halfway done is not good enough 710 days into care." The trial court further noted Father had not completed the parenting assessment. Although it lamented that the Interstate Compact was not utilized, the trial court noted there was evidence DCFS conferred with Oregon DHS and afterwards determined placing the children with Father "was not appropriate." Furthermore, the trial court observed Father could have done

- 8 -

the parenting assessment for free during one of his visits to Illinois in the relevant time period. The court ultimately concluded: "So considering the evidence presented before the Court today, I'm going to find the State has met their burden that [Father's] efforts and his progress towards the return of the children in the nine-month period of May 17, '19, to February 17th of 2020 has been proven *** by clear and convincing evidence."

¶ 24                                    D. Best-Interests Hearing

¶ 25        The trial court, with consent from the parties, immediately transitioned into a best-interests hearing. The State recalled current caseworker Mindy Waddell as its lone witness. Waddell testified all three children are placed together in a traditional foster home. She recounted her last visit with the children, where they all appeared clean, appropriately dressed, and well-fed. Waddell testified all three children attend school and are appropriately adjusted to their environment. She noted all three children call their foster parents, "mom and dad." She stated two other foster children live in the home and R.J., P.J., and A.J. "do really well with them." Waddell testified the foster parents are willing to adopt all three children. Based on her training and experience, Waddell opined the children's current placement to be a good one for them.

¶ 26        Waddell's testimony also addressed each child individually. R.J. had an individualized education plan and was doing well in school. He seemed happy and well adjusted, and he had said he feels safe in the foster home. Waddell described A.J. as "a very bubbly, happy, little girl," and she "does very well in the home." A.J. also did well in Head Start. Waddell described P.J. as "a very happy little boy." When asked about the children's contact with Father, Waddell noted Father had regular phone contact with P.J. and A.J. but "mostly [P.J.]." R.J. refused to participate in the calls because Father scared him and DCFS allowed him

to refuse after speaking with his therapist.

¶ 27    On cross-examination, CASA's counsel inquired about P.J. and A.J.'s phone visits with Father. The visits are video calls, and five-year-old A.J. has a hard time sitting still long enough for the visit. P.J. "sometimes gets scared" during the calls because Father "loses his temper with him."

¶ 28    Neither Father nor the CASA presented evidence at this hearing, and all parties waived oral argument.

¶ 29    The trial court found it must "consider today *** whether it's in the best interest of [R.J., A.J., and P.J.] that these parental rights of [Father] be terminated." Acknowledging the standard of review was a preponderance of the evidence, the trial court concluded the following:

> "The evidence the Court has just heard is uncontroverted
> that each of these children are clean, happy, well-fed, living in a
> loving environment, co-existing with one another. I'm going to
> find the State's easily met their burden, that it is in the best interest
> of [R.J., A.J., and P.J.], the Motion to Terminate Parental Rights be
> granted."

The trial court reduced its decision to a written order, advised Father of his appellate rights, and appointed appellate counsel when Father indicated he wanted to appeal.

¶ 30    In March 2021, Father filed a motion to reconsider the order, arguing the trial court erroneously terminated his parental rights. Father contended (1) there was evidence showing he was not responsible for the children's physical abuse, (2) he lived in Oregon "and had made efforts to comply with recommendations made," (3) he "was not given the opportunity to avail himself to the benefits provided by The [Interstate Compact on the Placement of

Children Act (Interstate Compact Act)]," and (4) the only reason the Interstate Compact Act was not triggered was "due to the inexperience of the case manager from One Hope United who supervised this case."

¶ 31    The trial court held a hearing on Father's motion in September 2021. Father's counsel argued DCFS should have initiated the Interstate Compact and Father's "really sole problem being able to complete in a timely manner what was requested of him was his financial inability to pay for the services which could have been assisted with had the Interstate Compact been triggered." Father's counsel argued DCFS abdicated its duty to reunite parents and children when it did not use the Interstate Compact Act to help Father. Counsel asked the trial court to reconsider its decision based on that failure. When asked by the court if there was "any evidence presented suggesting what would have been different had it been—the Interstate Compact been initiated," counsel responded, "I did not see any evidence that specifically showed a difference," but there was only speculation. The State opposed the motion, arguing, "the Court followed the law in ruling that [Father's] rights should be terminated" because "[h]e did little to no effort to correct things that would have been able to place the children with him." The trial court took the matter under advisement.

¶ 32    In its written order issued later that month, the trial court again noted its "serious concerns that the case worker in this matter was unfamiliar with resources available to assist parents in their efforts to be reunited with their children," namely the Interstate Compact. The trial court opined, "[t]his is a failure on behalf of the Department" because DCFS had an obligation to parents, children, and the court "to ensure that agencies they contract with are providing adequate training to employees." The order went on to read: "Despite these concerns, the Court does not believe the failure to initiate proceedings under the interstate compact impacts

the Court's determination that [Father] was an unfit parent." Addressing Father's contention that he lacked sufficient funds to complete services in Oregon, the trial court concluded, "[T]his is speculative" because Father "did not present any testimony to support assertions that he lacked the financial ability to complete" services or "that [Father] lacked *** resources to travel to Illinois" for free services. Ultimately, the trial court denied Father's motion, concluding again that since Father failed to complete the parenting assessment and domestic violence services, "[h]e failed to make reasonable efforts or progress to the return home of his children."

¶ 33 This appeal followed.

¶ 34 II. ANALYSIS

¶ 35 We initially comment on the delay in the issuance of this order. As a matter addressing the custody of minor children, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), requiring the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Father filed his initial notice of appeal on October 22, 2021, but, due to failure to comply with Illinois Supreme Court Rules, the case was submitted for our review December 29, 2021. Although every effort was made to comply with the deadline under Rule 311(a)(5), the record and substandard briefing precluded us from doing so, and we find good cause exists for the delay.

¶ 36 Father argues the trial court erroneously terminated his parental rights. We disagree and affirm the trial court's judgment.

¶ 37 Although Father's brief presents the "Issues Presented for Review" as "Did the trial Court err in its finding, by clear and convincing evidence, that the termination of [Father's] parental rights was appropriate and in the best interests of the minor children?", the argument

section makes no mention, let alone any argument, relating to the trial court's best interests determination. We, therefore, will not address the best-interests decision because "[a]n issue not clearly defined and sufficiently presented fails to satisfy the requirements of Rule 341(h)(7) and is waived." *Bublitz v. Wilkins Buick, Mazda, Suzuki, Inc.*, 377 Ill. App. 3d 781, 787, 881 N.E.2d 375, 381 (2007). Indeed, we have said: " 'Mere contentions, without argument or citation to authority, do not merit consideration on appeal.' " *Vance v. Joyner*, 2019 IL App (4th) 190136, ¶ 80, 146 N.E.3d 285 (quoting *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12, 969 N.E.2d 930). Though barebones and largely conclusory, Father's brief does offer some argument as to the unfitness determination, so we will consider it.

¶ 38        The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights. The State must first show the parent is an "unfit person," and then it must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998)) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). Here, Father challenges the trial court's first-step decision only—the unfitness finding.

¶ 39        " 'The State must prove parental unfitness by clear and convincing evidence.' " *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several grounds on which a trial court may find a parent unfit, including: the parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from

the parent during any nine-month period following the adjudication of neglect or abuse or dependency under the Juvenile Court Act (750 ILCS 50/1(D)(m)(i) (West 2018)), and the parent's failure to make reasonable progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2018)). Despite the various potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83, 19 N.E.3d 227; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." (citing *In re D.D.*, 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001))).

¶ 40            This court pays " 'great deference' " to a trial court's fitness finding " 'because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility.' " *A.L.*, 409 Ill. App. 3d at 500 (quoting *Jordan V.*, 347 Ill. App. 3d at 1067). We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since " ' "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts" ' " (*In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91 (quoting *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203, 899 N.E.2d 549, 558 (2008), quoting *Daphnie E.*, 368 Ill. App. 3d at 1064)), we now turn our attention to the facts of this case.

¶ 41            The State alleged Father was unfit based on two statutory grounds—failure to make reasonable efforts or progress toward the return of the child to the parent during any nine-month period following the adjudication of neglect or abuse, specifically May 17, 2019, to February 17, 2020 (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)). The trial court found the State

proved each count by clear and convincing evidence, making Father an unfit person under the Adoption Act. Father now challenges unfitness finding as against the manifest weight of the evidence, but he does so obliquely. He challenges the unfitness determination collectively, claiming he "had two things working against him," (1) "his inability to pay for the services that had been required of him" and (2) "Ms. Waddell's admitted ignorance of [th[e] [Interstate] Compact." Though he does not directly address the actual unfitness findings—reasonable efforts and reasonable progress—we must.

¶ 42          "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent [citation], and are judged by a subjective standard based on the amount of effort that is reasonable for a particular person [citation]." *Daphnie E.*, 368 Ill. App. 3d at 1066-67. Father's children came into care based on physical abuse and drugs in the home—R.J. and P.J. had bruises, welts, and abrasions all over their bodies, and police found drugs within reach of the children. Although Father did not inflict this physical abuse, DCFS determined he must complete domestic abuse services. There were two reasons for this requirement—his children were victims of domestic abuse and the children's mother had indicated she fled Oregon and Father due to physical abuse to R.J. Thus, correcting the conditions that caused the children to come into care required this particular father to show reasonable efforts to ensure the children's physical safety and well-being would be secure should they be placed in his home. The trial court determined Father's failure to complete the parenting assessment or domestic violence perpetrator services between May 2019 and February 2020 did not amount to reasonable efforts considering the reasons the children came into care, physical abuse and exposure to drugs. The trial court said expressly: "The most concerning issue to the Court is the domestic violence services because these children were taken into care with bruising

all over them and abuse perpetrated in the home ***. So these are victims of domestic violence." There was evidence Father made some effort towards completing domestic violence services between May 2019 and February 2020. He attended Bridges 2 Safety for a domestic violence assessment and orientation. As of January 18, 2020, he had attended 12 of 36 sessions. He also made payments for these services via credit card, which undercuts his theory that his inability to pay for services worked against him. But there was also testimony that this first attempt at completing domestic violence services stalled because Father voluntarily quit services and was dishonest during the initial assessment. Father eventually restarted domestic violence services after the relevant nine-month period ended in February 2020, and at the time of the termination hearing in February 2021, he had completed 18 of 36 sessions. The trial court found these efforts unreasonable given that domestic violence served as the primary reason the children came into care and Father showed some ability to engage in and pay for services, yet he quit inexplicably.

¶ 43        Based on this evidence, we cannot conclude the trial court's finding of lack of reasonable efforts was in error. The trial court's conclusion does not stand against the manifest weight of the evidence. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 44        As for the reasonable progress determination, we have previously explained "reasonable progress is an objective standard," measuring whether "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstratable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *F.P.*, 2014 IL App (4th) 140360, ¶ 88. The record shows Father completed no services during the nine-month period from May 17, 2019, to February 17, 2020. The two services he completed came after February 2020—the mental health assessment in September 2020 and substance abuse services

- 16 -

verification from January 2021. He started, but did not finish, domestic violence services. As we noted above, the trial court found these services to be a necessary prerequisite to placement of the children in Father's care. Consequently, at no point from May 2019 to February 2020 could the trial court have placed the children in Father's care in the near future. Father, therefore, did not make reasonable progress during the first nine-month period from July 2018 to April 2019. See *F.P.*, 2014 IL App (4th) 140360, ¶ 88. No doubt Father made some progress after this period, but that later progress cannot redeem nine months of little to no progress. See *In re K.H.*, 346 Ill. App. 3d 443, 455, 804 N.E.2d 1108, 1118 (2004) (explaining that section 1(D)(m)(ii) of the Adoption Act "mandates that parents must, with some degree of consistency, make reasonable progress toward their children's return home or risk forfeiting their parental rights"). Since the evidence confirms Father did not make reasonable progress during any nine-month period, we conclude the trial court's unfitness finding does not stand against the manifest weight of the evidence because the opposite finding (*i.e.*, fitness) is not readily apparent. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 45 Father challenges the trial court's unfitness findings based on his inability to pay for services and Waddell's inexperience with the Interstate Compact. We take each reason in turn. Like the trial court, we note there is little evidence in the record documenting Father's financial situation, the cost of services, and his inability to pay. As Father's counsel acknowledged, there is only speculation that Father could not afford services, but the record belies such speculation. The record shows Father was able to pay for domestic violence services in the relevant time period, but he stopped services. More importantly, Father opted to self-pay for services in Oregon rather than travel to Illinois for free services. He cannot now complain about cost.

¶ 46        As for the Interstate Compact, the trial court and Father's counsel made much of the fact that neither DCFS nor One Hope United initiated the compact here. The trial court laid the blame at DCFS's doorstep while Father placed the blame on Waddell's shoulders. But as early as August 2019, both Father's counsel and the trial court were aware Father wanted to receive services in Oregon, so shifting blame late in the proceedings seems disingenuous at best. Rather than seeking to whom blame should be assigned, we look to the applicable statute and notice there is no certainty it would have applied here. See 45 ILCS 15/1 art. III (West 2018) (listing conditions for placement); 45 ILCS 15/1 art. VIII (West 2018) (noting circumstances when the compact shall not apply). Under the conditions for placement, the one omission is with a parent, and under the limitations section, the statute says the compact does not apply to "the sending or bringing of a child into a receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with such relative or non-agency guardian in the receiving state." 45 ILCS 15/1 art. VIII(a) (West 2018). Not in the trial court, nor in the briefing on appeal, did Father point to any section of the statute which would have provided the relief he now contends was withheld. Plus, we note Waddell testified at some point she had conversations with Oregon DHS and afterwards determined Father was not an appropriate placement. The Interstate Compact focuses on placement of children with nonrelatives, such as through foster placement or adoption. If placement with Father in Oregon was not appropriate, then there was little the Interstate Compact could do. We find Father's argument unconvincing, nevertheless. Defense counsel conceded at the motion-for-reconsideration hearing that there was no evidence things would have been different (*i.e.*, Father would have put forth reasonable efforts or made reasonable progress) had the Interstate Compact been implemented. With this concession, we cannot find the opposite

conclusion to be readily apparent at all. See *A.L.*, 409 Ill. App. 3d at 500. We find Father's arguments unpersuasive and insufficient to alter our conclusion the trial court's unfitness determination is not against the manifest weight of the evidence. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 47                                      III. CONCLUSION

¶ 48          For the reasons stated, we affirm the trial court's judgment.

¶ 49          Affirmed.