FIFTH DIVISION

No. 1-08-1575

| | | |
|---|---|---|
| In re | ) | Appeal from the |
| | ) | Circuit Court of |
| KONSTANTINOS H., a Minor, | ) | Cook County. |
| | ) | |
| Respondent-Appellee | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | No. 05JA0332 |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | The Honorable |
| v. | ) | Stephen Brodhay, |
| | ) | Judge Presiding. |
| Leeann F. | ) | |
| | ) | |
| Respondent-Appellant). | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Respondent Leeann F. (respondent) appeals from an order finding her to be an unfit parent and terminating her parental rights to her minor child, Konstantinos H. (K.H.). The State and the public guardian have filed appellees' briefs. For the reasons that follow, we affirm.

BACKGROUND

K.H. is a boy born to respondent on February 4, 2005. He has lived with his maternal aunt, Karyn O. (Karyn), since he was approximately two months old. On March 25, 2005, respondent was incarcerated on charges of child endangerment and for violation of the terms of her parole. As a result, on the same day, the Department of Children and Family Services (DCFS) took protective custody of K.H. On March 29, 2005, the State filed a petition for adjudication of

No. 1-08-1575

wardship alleging that K.H. was abused and neglected pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b), 2-3(2)(ii) (West 2004)). In part, the petition alleged:

"Natural mother has an extensive history of abusing controlled substances, including vicodin, which natural mother states she mixes with alcohol. At the time of this monor's birth, natural mother tested positive for opiates. Natural mother has refused to participate in offered and recommended services, including drug treatment. Natural mother admits to current excessive usage of vicodin mixed with alcohol. * * * Natural mother is currently incarcerated. Paternity has not been established."

The public defender was appointed to represent respondent, and the public guardian was appointed to represent K.H. The parties stipulated to the facts alleged in the petition, and the trial court entered a temporary custody order finding that urgent and immediate necessity required K.H. to be removed from his home.

Initially, K.H. was placed in the care of a relative of the putative father, Chris H., originally named in the State's petition. On April 12, 2005, however, paternity results revealed that Chris H. was not the father of K.H.[1] K.H. was then placed in the care of his maternal aunt, Karyn, and has been in her exclusive care since April 2005. Respondent was released from jail on July 28, 2005. On July 29, 2005, following a hearing that respondent did not attend, the court entered an adjudication order finding that K.H. was abused or neglected based on a substantial

---

[1]The State subsequently amended its petition, naming Nikkos G. the father of K.H. Nikkos G. is not a party to this appeal.

2

risk of physical harm and an injurious environment because:

"natural mother admits to history of and current misuse of vicodin and alcohol and

has not been involved in services to address this issue."

On August 29, 2005, following a hearing that respondent did not attend, the court entered a

dispositional order adjudicating K.H. a ward of the court and finding that respondent was unable

and unwilling to care for K.H.

On January 19, 2006, the court held a permanency planning hearing. Respondent was

again incarcerated, but appeared in court through a writ. The court entered a permanency

planning order based upon respondent's reported participation in drug treatment services while

incarcerated. This permanency order established the goal of K.H.'s return home within 12

months, but noted that respondent had not made substantial progress toward the return home of

K.H.

On August 31, 2006, the court entered a permanency order with the goal of substitute

care pending court determination on the termination of parental rights. The court noted:

"The reasons for selecting this goal and for ruling out the preceding goals are: The

parents have failed to make substantial progress towards reunification. The minor

[is] 1 ½ years old and has been with his [maternal aunt] since [April 2005]."

On January 16, 2007, the court entered another permanency order with a goal of substitute care

pending court determination of termination of parental rights, noting:

"The mother has not made substantial progress towards reunification. The minor

[is] 1 ½ years old [and] is in a pre-adoptive home with his aunt."

3

No. 1-08-1575

On February 21, 2007, the State filed a supplemental petition for the appointment of a guardian with the right to consent to K.H.'s adoption. The petition alleged that respondent was unfit to parent K.H. and that it was in K.H.'s best interest to appoint a guardian with the right to consent to his adoption. Specifically, the termination petition alleged that respondent was unfit under section 1(D)(b) of the Adoption Act for failure to maintain a reasonable degree of interest, concern or responsibility as to K.H.'s welfare; under section 1(D)(k) of the Adoption Act for being a habitual drunkard; and under section 1(D)(m) of the Adoption Act for failure to make reasonable effort to correct the conditions which were the basis for K.H.'s removal and/or failed to make reasonable efforts and progress towards K.H.'s return within nine months from the adjudication of neglect, or within any subsequent nine-month period. 750 ILCS 50/1(D)(b), (D)(m), (D)(k) (West 2004).

Termination Hearing

The termination hearing spanned three days. The unfitness portion of the proceeding took place December 11, 2007, and February 11, 2008, and the best interest portion of the proceeding took place on June 5, 2008.

Byrony Lynn Altamirano[2] testified that she had been the family's Catholic Charities child-welfare caseworker from August 12, 2005, to May 2007. Upon assignment, Altamirano reviewed the case file and noted that respondent was released from jail on July 28, 2005. She testified that the case began in response to a DCFS hotline call regarding allegations that respondent was

---

[2]Ms. Altamirano apparently changed her name during these proceedings and is referred to as both Bryony Lynn Altamirano and Byrony Romanelli. For consistency, we will refer to her as Altamirano.

4

continually under the influence of alcohol and Vicodin and had an infant son, K.H. The police recovered drug paraphernalia and cocaine from respondent's residence. Respondent was on parole. She testified that the first time she was able to make contact with respondent was at a January 19, 2006, permanency hearing. Between August 2005 and January 2006, she attempted unsuccessfully to contact respondent by telephone and mail. She also performed diligent searches that included jail checks.

Altamirano testified that her supervisor, Julie Gilberts, and another caseworker, Gordon Neumann, handled the case prior to her assignment. Altamirano first attempted to make contact in September 2005.

In October 2005, Altamirano spoke with Karyn, who informed her that respondent was incarcerated. Altamirano informed supervisor Gilberts about this. Altamirano testified that she then conducted a computerized inmate search, but was unable to locate respondent.

On cross-examination, Altamirano admitted she was aware that respondent called Altamirano's supervisor on July 28, 2005, and left a message for the supervisor on August 26, 2005. She also admitted that, according to her case note, she first attempted to call respondent on September 20, 2005. Altamirano acknowledged her case note, but testified that she may have called respondent prior to that time.

Altamirano testified that her first contact with respondent was immediately following the January 19, 2006, permanency hearing. At that time, she gave respondent a copy of the service plan and explained the services that respondent needed in order to reunify with K.H. This service plan, dated September 21, 2005, is included in the record on appeal. Specifically, the

reunification service tasks listed in the service plan include: (1) a psychiatric evaluation; (2) inpatient drug treatment and follow-up services as provided and recommended by her drug counselor; (3) individual and group counseling to address drug abuse; (4) continue with any and all recommended services required by her parole officer; (5) participate in parent-child visits; (6) complete parenting classes; and (7) maintain consistent contact with the child-welfare agency. Altamirano testified that, at this time, respondent informed her that she did not want visits with K.H. at the jail because she would be released soon.

Respondent gave Altamirano a certificate showing completion of the Haymarket inpatient drug treatment program within the Cook County Department of Corrections. When asked, respondent informed Altamirano that her drug counselor was Ms. Monroe. But, when Altamirano attempted to contact Monroe at the jail via telephone calls and a letter, she was unsuccessful. Altamirano testified she explained to respondent that, when released, she would need to attend narcotics anonymous (NA) and alcoholics anonymous (AA) meetings and submit to random urine testing. Respondent also gave Altamirano two certificates for other classes completed at the jail. One of the certificates reflected that, on January 25, 2006, respondent completed the "CLAIM" class, a "parental rights and responsibilities under Illinois law" class. The other certificate reflected that respondent participated in the "safety and empowerment group" from February 14, 2006, through March 9, 2006.

Altamirano testified that she specifically told respondent that the service plan required her to complete a psychological evaluation and follow any recommendations arising from the evaluation, cooperate with her parole officer, visit with K.H., and attend a parenting class.

Altamirano testified that respondent had been incarcerated twice since the case was opened. During her second incarceration, Altamirano went to the jail two times in March 2006 to meet with respondent, but was unsuccessful both times, once because respondent was in court and the other because Altamirano was there on the wrong visiting day.

Altamirano spoke with respondent upon release from jail in March 2006, informing her that they needed to meet in person to further discuss the services respondent needed. Altamirano spoke "several times" with respondent by telephone, informing her that it was important to meet in person so that "we could talk in depth about any past services she might have completed and so that we would be able to provide a better referral for her for services at that time." Altamirano scheduled multiple "Child and Family Team" meetings with respondent to discuss the service plan and services, as well as for respondent to submit a urine sample. Respondent did not attend any of these meetings, cancelling one without explanation and simply not attending others.

Altamirano testified that, although she requested urine samples from respondent twice per month, respondent did not comply. She testified that she drove respondent to her first scheduled urine screening, but did not accompany her inside the building. Respondent did not complete the screening because she had a cracked identification card. Altamirano offered to drive respondent to get a new identification card and pay for it, but respondent declined the offer. Altamirano further testified that, after the first failed attempt at obtaining a urine sample, she continued to contact respondent to request further urine samples, but respondent did not comply. Altamirano explained that a cracked identification card should not have prevented respondent from following through with the urine screening because it was common practice to have the laboratory where

the urine screens were performed call caseworkers to confirm the identity of the client.

Respondent also failed to provide proof that she had engaged in outpatient drug treatment or attended AA or NA meetings. Moreover, respondent was unable to remember her parole officer's name and unable to supply Altamirano with the officer's contact information.

On cross-examination, Altamirano admitted that the psychological testing and the parenting class that she had arranged for respondent were canceled before respondent had opportunity to attend them because the case goal changed. Altamirano testified that, after the goal changed and her agency was no longer required to provide reunification services, she continued to identify community-based resources through which respondent could complete her reunification service tasks. Altamirano testified that, on at least two occasions, she provided respondent with lists of resources in her immediate community where she could obtain free or lower-priced mental health, parenting, and drug treatment services. Altamirano informed respondent that it was respondent's responsibility to obtain these needed services. Respondent was unemployed and lacked stable housing at the time of the goal change. Respondent never provided her with documentation showing that she sought out and participated in random urine testing or NA/AA meetings.

Respondent arrived 40 minutes late to her first visit with K.H. on March 29, 2006. After the visit, K.H.'s foster mother, Karyn, informed Altamirano that K.H. cried a lot for two days following the visit. Accordingly, Altamirano and her supervisor requested a clinical staffing, which was held April 20, 2006. At the staffing, it was determined that weekly visits with respondent would help increase a bond between K.H. and respondent and decrease K.H.'s

negative reactions following the visits. The first such visit was scheduled for May 1, 2006.

Altamirano testified that she compiled four service plans for respondent, dated March 21, 2005; March 7, 2006; September 14, 2006; and March 14, 2007. These plans were entered into evidence.

Respondent did not see K.H. from March 2005 until March 29, 2006. Respondent was incarcerated twice during this case, from March 23, 2005, through July 28, 2005, and again in September or October 2005 through March 2006. Respondent chose not to see K.H. while she was incarcerated. During the time between incarcerations, respondent did not visit with K.H. The March 7, 2006, service plan includes a list of scheduled visitation between respondent and K.H. As of April 20. 2006, respondent was scheduled for weekly one-hour, supervised visits at Catholic Charities. According to this list, visits were scheduled on May 1, 8,15, and 25, 2006. Respondent attend the visit on May 1, but cancelled both the May 8 and May 15 visits, once because she was ill and once because she missed the bus. On May 24, 2006, respondent confirmed that she would attend the May 25 visit, but did not do so. Altamirano and K.H. waited for her for 20 minutes.

The June visits were scheduled for June 1, 5, 15, and 29. Of these, respondent attended the June 5 visit, but cancelled the June 1 and 15 visits. Altamirano cancelled the June 29 visit due to an emergency. The July visits were scheduled for July 6, 13, 20, and 27. Respondent attended the July 6 visit, which was extended one hour to make up for the June 29 visit cancelled by Altamirano. Respondent confirmed that she would attend the July 13 visit, but did not. Altamirano cancelled the July 20 visit due to an emergency and extended the July 27 visit, which

9

respondent attended, one hour to make up for it.

After the permanency goal for K.H. changed on July 31, 2006, to substitute care pending court determination on termination of parental rights, visits were modified from weekly to monthly. Respondent failed to confirm her scheduled August 24, 2006, visit, and it was cancelled. Respondent attended five of the six scheduled visits between September 2006 and February 2007. As of the December 11, 2007, court date, respondent's last visit was the previous February.

Following Altamirano's testimony, respondent made a motion for a directed finding. After hearing arguments from both parties, the court granted the motion as to grounds (k) and (m), and denied the motion as to (b), that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for K.H. See 750 ILCS 50/1(D)(b), (D)(k), (D)(m) (West 2004).

Respondent testified that she was 37 years old and currently living with her ex-husband and their two daughters, 14-year-old Alexis and 12-year-old Daniella. Respondent denied drinking alcohol in 2005, stating that she "didn't even like the smell of alcohol." She testified that she began taking Vicodin after she had back surgery in 2003. She admitted that, prior to K.H.'s birth, she had been arrested for possession of a controlled substance and that her parole ended in 2003.

K.H. was born on February 4, 2005, and came home from the hospital on February 14, 2005. Respondent cared for him in her home until she was arrested for possession of drugs in her home on March 23, 2005. She denied that the drugs were hers. She remained in jail until she bonded out on July 28, 2005. While incarcerated, caseworker Neumann and supervisor Gilberts

visited her and discussed the services she needed. She testified that she requested visits with K.H. but did not receive them. After release, respondent left two telephone messages with Gilberts to find out what she needed to do to get K.H. back.

Respondent admitted that she was reincarcerated in September 2005 after missing a court date. She claimed she tried to call Gilberts from jail, but that Gilbert's agency did not accept collect calls. Respondent was unable to contact any caseworkers. She called Karyn and her mother in October and asked her mother to notify her caseworker that she was in jail. No caseworker visited her in jail.

While incarcerated, respondent engaged in services because "that's what they wanted me to do." She received inpatient drug treatment, daily group counseling, individual counseling two to three times per week, daily NA meetings, and weekly AA meetings. She also completed a CLAIM class, which she explained was similar to a parenting class, and a safety empowerment class. She pled guilty to the possession of a controlled substance at the end of March 2006, reporting that she did so in order to get out of jail faster.

Respondent admitted that she discussed services with Altamirano after court on January 19, 2006. She reported that Altamirano planned to visit her in jail but failed to do so. After her release from jail in March 2006, respondent spoke with Altamirano and scheduled a visit with K.H. for March 29, 2006. She stated that the visit was "great." Respondent admitted that she missed some visits between May and July of 2006, but explained that she was sick and also had transportation issues. Respondent testified that she attempted to call Karyn, but that Karyn told her to stop calling and had her telephone number changed.

11

Respondent testified that she first spoke with Altamirano about putting services into place in July 2006, and was willing to do what Altamirano requested. Respondent said she was willing to have a psychiatric evaluation, attend counseling, and take parenting classes. Altamirano told respondent that the classes would begin in September. However, when the classes were to start, she was told that she would have to pay for them herself because the goal had changed. Respondent was unemployed and did not have the money to pay for the services. Respondent admitted that Altamirano told her where she could get the services on her own.

Respondent testified that she went to an AA meeting on the fourth day she was out of jail the second time. She claimed that she was currently attending meetings three or four times per week, but admitted that she did not have meeting log sheets of her attendance because she "didn't think she needed them anymore." Respondent testified that she provided one sign-in sheet to Altamirano in July 2006, but now has "no clue" where it is and had made no attempt to look for it. Respondent testified that she was currently in individual counseling and group counseling and had seen a psychologist. Respondent testified that she was only asked to provide random urine samples on two occasions. The first scheduled appointment for the urine sample was not completed because she had a cracked identification card. The second appointment was not completed because she was late and the laboratory was closed.

Respondent testified that her last visit with K.H. was in February 2007. Altamirano contacted her before the scheduled March 2007 visit and informed her that Catholic Charities was no longer responsible for her case and another caseworker would contact her. Respondent testified that no caseworker contacted her until Jamie Fair contacted her at the end of June or July

2007. Respondent testified that Fair scheduled a visit for July 31, 2007, but did not arrive at the meeting place. Respondent testified that, since July 31, 2007, she had made 75 requests for visits, but had not had a visit with K.H. since February 2007. She did not attempt to call her Karyn to set up a visit with K.H. because she did not have her telephone number.

On cross-examination, respondent admitted that, although she knew K.H. was living with her sister, she did not send K.H. any cards, gifts, or letters while she was incarcerated from March 2005 through July 2005, or during her second incarceration from October 2006 through March 2006. Nor did she send K.H. any cards, gifts, or letters during the months between her incarcerations or after she was released from jail in March 2006. On one occasion, in 2006, she left gifts for K.H. at the child welfare agency.

Respondent testified that she informed Altamirano that she was attending NA/AA meetings and that she was in counseling. She also told caseworker Fair that she was seeing a psychologist. She testified that the first time she met Fair was in court on the day of this hearing.

Respondent acknowledged that she was not incarcerated at the time of the adjudication hearing or the dispositional hearing, but that she did not attend either hearing. She admitted that she was not present when the permanency goal changed to substitute care pending court determination on termination of parental rights, but learned of the change in the goal through Altamirano. Respondent knew she was assigned an attorney throughout the time the case was pending in court.

Fair testified that she is a caseworker from a child welfare agency called ChildServ, and was assigned to this case by Donna Johnson on July 2, 2007. Johnson and respondent had been in

13

contact prior to Fair's assignment. Fair was unable to contact respondent because the telephone numbers in the file were incorrect. Her first contact with respondent was the second week of August 2007 when respondent called her. They arranged a visit with K.H. for August 31, 2007. Fair explained that, in order to confirm the visit, respondent was required to call Fair's office or cell phone 24 hours prior to the visit to either confirm or cancel. The August 31 visit did not occur because respondent failed to confirm.

Respondent telephoned Fair after the missed visit and another visit was scheduled for September 4, 2007. Respondent cancelled the visit. Visits were scheduled for September 10 and 17, 2007, and respondent again cancelled. A scheduled mid-October visit was cancelled by Fair due to illness. A late-October visit was cancelled by respondent due to illness. Fair and respondent were unable to reach one another after October 2007.

Fair testified that respondent failed to supply her with any documentation regarding current services in which she was participating. Respondent did not inform Fair that she was participating in services.

On cross-examination, Fair acknowledged that her September 10, 2007, service plan indicated that respondent had recently begun counseling. Fair acknowledged that her date book reflected that respondent first called her on July 24, 2007, and that the first visit was scheduled for July 31, 2007. Fair testified that she made a mistake on direct examination when she testified that the date was August 31.

Fair denied that respondent requested services directly from her. Fair testified that, since her assignment to the case, respondent has kept in contact with her and has requested visits. She

14

acknowledged that she canceled more than one visit that she set up for respondent.

On questioning from the court, Fair testified that the July 31, 2007, visit did not take place because respondent did not call 24 hours before the visit to confirm. Fair testified that she considered a failure to confirm a visit to be a cancellation.

Counsel for respondent stipulated that the May 6, 2005, social history and integrated assessment conducted by a DCFS clinical screener contained a section entitled "child's interaction with caretaker/birthparent." The report noted that the assessment team could not assess K.H.'s interactions with respondent because respondent was incarcerated and did not want visitation while she was in jail.

After arguments from all parties, the court found that the State had established by clear and convincing evidence that respondent was unfit due to her failure to maintain a reasonable degree of interest, concern, or responsibility as to K.H.'s welfare. While acknowledging its concern regarding the lack of casework efficiency, the court specifically found that respondent was not excused from showing her interest, concern, and responsibility for K.H. The court noted that all respondent was actually being asked to do was visit K.H. on a regular basis, give random urine samples, and attend NA/AA meetings. The court further noted that the only service respondent completed was in-patient drug treatment, which she was "basically forced to do because she was incarcerated."

In finding that respondent failed to show a reasonable amount of responsibility and concern for K.H., the court relied on evidence that respondent failed to participate in regular visitation with her son, failed to participate in NA/AA meetings, failed to attend case meetings,

failed to attend court hearings, and failed to provide random urine samples. The court further noted that evidence of respondent's failure to show a reasonable amount of responsibility for K.H. was established when respondent was re-arrested because she missed a court date and, as a result, had no contact with her son for the first year of his life. Moreover, even after her release from jail, she did not visit K.H. regularly. The court found that respondent's lack of visitation showed a lack of concern and responsibility for K.H. Likewise, the court found that respondent's failure to provide random urine samples and proof of attendance at NA/AA meetings, which she knew she was required to do, "showed no concern to maintain sobriety," and thus a lack of concern and responsibility toward the welfare of her son.

In regard to respondent's inconsistent visitation, the court stated:

"[Y]ou would think that a reasonable parent * * * who is trying to become a good parent would try very hard not to miss any visits once released from jail."

The court acknowledged the poor level of casework in this case, but stated:

"[T]he fact that the case workers may have been remiss in providing referrals for services or not affording the mother appropriate opportunity for services does not rise to the level of preventing the mother from showing her concern and interest and responsibility toward the minor."

Further the court stated that, regardless of the case workers involved here:

"[The court] was unaware of any case law that indicates that impropriety is a defense to a lack of reasonable concern or responsibility towards the minor."

The court further stated that, had respondent truly been concerned about the welfare of her son,

she would have kept in close contact with the agency and "demand that she have random urine drops or anything else." The court noted that respondent had an opportunity to provide the court with evidence of her attendance at NA/AA meetings and random urine samples prior to the goal change in August 2006 but failed to do so.

Based on these findings, the trial court held that the State proved by clear and convincing evidence that respondent failed to show the requisite responsibility and concern for her son's welfare.

The best interest hearing was held June 5, 2008. After hearing testimony from the current caseworker, the foster parent, and respondent, as well as closing arguments from counsel, the court found that it was in K.H.'s best interest to terminate respondent's parental rights.

Respondent appeals the finding of unfitness.

ANALYSIS

Respondent contends that the court's finding of unfitness based on section 1(D)(b) of the Adoption Act was against the manifest weight of the evidence. Specifically, respondent argues that her ability to maintain interest, concern, and responsibility for K.H. was hampered by her caseworkers' incompetence to such a degree that her behavior should be excused. We disagree.

The Juvenile Court Act of 1987 provides a bifurcated mechanism whereby parental rights may be terminated. 705 ILCS 405/2-29(2) (West 2004). Under this procedure, there must first be a showing of parental unfitness based upon clear and convincing evidence, and a subsequent showing that the best interests of the child are served by severing parental rights. In re M.J., 314 Ill. App. 3d 649, 655 (2000). "A trial court's determination of parental rights involves factual

17

findings and credibility assessments that the trial court is in the best position to make." In re M.J., 314 Ill. App. 3d at 655. Accordingly, we will not disturb a finding of unfitness unless it is contrary to the manifest weight of the evidence and the record clearly demonstrates that the opposite result was proper. In re D.D., 196 Ill. 2d 405, 417 (2001). "Each case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." In re Daphnie, 368 Ill. App. 3d 1052, 1064 (2006). A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act. In re D.D., 196 Ill. 2d at 422.

To find a parent unfit under section 1(D)(b) of the Adoption Act, and avoid the necessity of obtaining the parent's consent for adoption, the trial court must find clear and convincing evidence that the parent failed "to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2004). Because this language is in the disjunctive, any of these three elements may be considered on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest *or* concern *or* responsibility as to the child's welfare. In re Jaron Z., 348 Ill. App. 3d 239, 259 (2004). In examining allegations under subsection (b), a trial court must focus on a parent's reasonable efforts rather than her success, and must consider any circumstances that may have made it difficult for her to visit, communicate with, or otherwise show interest in her child. In re Jaron Z., 348 Ill. App. 3d at 259; In re M.J., 314 Ill. App. 3d at 655. The court should examine a parent's conduct in the context of in which it occurs, including any difficult in obtaining transportation to the child's residence, the parent's poverty, conduct of others that hinders visitation, and the motivation

18

underlying the failure to visit. In re Adoption of Syck, 138 Ill. 2d 255, 279 (1990). "If personal visits were somehow impractical, courts consider whether a reasonable degree of concern was demonstrated through letters, telephone calls, and gifts to the child, taking into account the frequency and nature of those contacts. In re Daphnie, 368 Ill. App. 3d at 1064. Noncompliance with an imposed service plan and infrequent or irregular visitation with the child may be sufficient to warrant a finding of unfitness under section (b). In re Jaron Z., 348 Ill. App. 3d at 259.

Respondent argues that her failure to complete random urine testing, her failure to provide proof of attendance at NA/AA meetings, and her inconsistent visitation with K.H. was caused by the child-welfare agencies' indifference and inadequate delivery of services. This, however, is not supported by the record. While we recognize that the caseworkers could have been more effective, the ultimate responsibility for maintaining a reasonable degree of interest, concern, and responsibility for K.H. rested with respondent. In its ruling, the court acknowledged that there were efficiency issues regarding the handling of this case by the caseworkers, but it specifically found that the lack of efficiency on the part of the workers did "not rise to the level of preventing mother from showing her concern and interest and responsibility toward the minor." We agree.

Here, the evidence clearly supports the trial court's finding that respondent was unfit based on her failure to maintain a reasonable degree of interest, concern or responsibility for K.H. Respondent knew she was required to submit urine samples, attend NA/AA meetings, have a psychological assessment, complete parenting classes, and visit regularly with K.H., but she failed to do so. Caseworker Altamirano testified that she told respondent that the service plan required these things. After the goal changed and her agency would no longer provide various services,

Altamirano provided respondent with information regarding low-cost or free services and told her that it was now her responsibility to obtain the necessary services. Respondent admitted that Altamirano had given her this information.

Despite knowing that her attendance at NA/AA meetings and her participation with random urine testing was required in order to comply with outpatient drug recovery and reunify with K.H., the evidence shows that respondent failed to follow through with those service directives. Although respondent claimed she attended NA/AA meetings, she offered no evidence of her attendance. Respondent also failed to complete any random urine testing. Altamirano accompanied respondent to her first scheduled urine drop, but it was not completed because respondent did not have appropriate identification. Respondent failed to complete the next scheduled urine screen because she arrived late and the laboratory had already closed for the day. Altamirano continued to request urine samples from respondent twice monthly to no avail.

Moreover, respondent failed to visit regularly with K.H. Respondent chose not to see K.H. while she was incarcerated. Initially, she was incarcerated from March 23, 2005, until July 28, 2005. She did not visit with K.H. while out on bond between July 28, 2005, and fall 2005. Respondent's second incarceration in September 2005 was easily avoidable, but she chose to violate her parole by missing a mandatory court date, resulting in her reincarceration. She remained in jail until March 2006 and, by choice, did not see K.H. during this time. At that time, respondent was 13 months old, and respondent had not seen him in a full year. After her first visit with K.H., to which respondent arrived 40 minutes late, the record reflects that respondent missed more visits than she attended. From March 2006 through the end of August 2006, respondent

was scheduled for weekly visits, but cancelled seven visits, often without explanation.

Nor did respondent manifest her concern for K.H. by sending cards, gifts, or letters. Other than one occasion in 2006, respondent sent no cards, gifts, or letters to K.H. throughout his life. She apparently only telephoned Karyn's house, where K.H. lived, two times. There is no evidence in the record that she made any effort to contact K.H. through Karyn after Karyn changed her telephone number.

Even within the context of respondent's personal circumstances, her repeated failure to maintain regular visitation with K.H. and her continued failure to comply with even the most basic aspects of the service plan demonstrate that she has not maintained a reasonable degree of responsibility toward the welfare of K.H. Therefore, the trial court's finding that respondent was unfit pursuant to subsection (b) of the Adoption Act was not against the manifest weight of the evidence.

For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

O'MARA FROSSARD and TOOMIN, JJ., concur.

No. 1-08-1575

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
### (Front Sheet to be Attached to Each Case)

Please use the following form

In re

KONSTANTINOS H., a Minor,

Respondent-Appellee

(The People of the State of Illinois,

Petitioner-Appellee,

v.

Leeann F.

Respondent-Appellant).

---

Docket No.

COURT
 Opinion
  Filed

No. 1-08-1575

Appellate Court of Illinois
First District, FIFTH Division

December 5, 2008
(Give month, day and year)

---

JUSTICES

PRESIDING JUSTICE JAMES FITZGERALD SMITH DELIVERED THE OPINION OF THE COURT:
O'MARA FROSSARD and TOOMIN, JJ.,   concur.

---

APPEAL from the Circuit Court of Cook County; the Hon_____ Judge Presiding.

Lower Court and Trial Judge(s) in form indicated in margin:

Appeal from the Circuit Court of Cook County.

The Hon. STEPHEN BRODHAY, Judge presiding.

---

FOR APPELLANTS
John Doe, of Chicago

For APPELLEES, :

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word or NONE if not represented.

APPELLANT: MARV RAIDBARD, Chicago, IL Marv Raidbard

Smith and Smith of Chicago,

APPELLEE (PETITIONER): STATE'S ATTORNEY, COUNTY OF COOK, Chicago, IL Richard A. Devine, State's Attorney; James E. Fitzgerald, Nancy Kisicki, Nancy Faulls, Assistant State's Attorneys

APPELLEE (RESPONDENT): OFFICE OF THE COOK COUNTY PUBLIC GUARDIAN, Chicago, IL Robert F. Harris, Kass A. Plain, Michelle V. Hamilton

---

(Joseph Brown, of counsel)
Add attorneys for third-party appellants and/or

22

appellees.