2025 IL App (1st) 241614-U

No. 1-24-1614

Order filed March 19, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| *In re* D.L., a Minor, | ) |
| | ) Appeal from the |
| (The People of the State of Illinois, | ) Circuit Court of |
| | ) Cook County. |
| Petitioner-Appellee, | ) |
| | ) No. 19 JA 855 |
| v. | ) |
| | ) Honorable |
| Sade T., | ) Tiesha Smith, |
| | ) Judge Presiding. |
| Respondent-Appellant). | ) |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Martin and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's judgment, which found respondent unfit and terminated her parental rights, is affirmed.

¶ 2    On January 14, 2021, the trial court found that respondent Sade T.'s son, D.L., was abused

and neglected. D.L. was subsequently made a ward of the court on March 26, 2021. On February

22, 2022, the State filed a supplemental petition alleging that respondent[1] was an unfit parent and that it was in D.L.'s best interest to terminate respondent's parental rights and appoint a guardian with the right to consent to D.L.'s adoption. Following a hearing, the trial court found that respondent was unfit, terminated her parental rights, and appointed the Department of Children and Family Services (DCFS) as guardian with the right to consent to D.L.'s adoption. Respondent now appeals, arguing that the State failed to meet its burden of proof to show that respondent was unfit or, in the alternative, that the State failed to meet its burden of proof that termination of parental rights and the appointment of a guardian was in D.L.'s best interest.

¶ 3     For the reasons that follow, we affirm the judgment of the trial court.[2]

¶ 4                                    I. BACKGROUND

¶ 5     On August 7, 2019, the State filed a petition for adjudication of wardship of D.L., who was born on July 20, 2019. The State alleged that D.L. was born with a controlled substance in his blood that was not the result of medical treatment, and that respondent admitted to using controlled substances while pregnant with D.L. The State further alleged that D.L.'s father, Hurlice L., had two other children in the custody of DCFS, and that respondent was offered intact recovery services, but declined. The same day, the State filed a motion for temporary custody. While the record does not contain an order granting that motion, it undoubtedly was because the record shows that D.L. was placed in the care of fictive kin, Ashley M., for the entire pendency of this case.

¶ 6     On January 14, 2021, following a hearing, the trial court found D.L. to be abused or neglected on the basis that he was a substance-exposed infant subject to an injurious environment

---

[1]D.L.'s father, Hurlice L., was a respondent below, but he is not a party to this appeal.

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

and a substantial risk of injury. On March 26, 2021, the trial court adjudicated D.L. a ward of the court on the basis that neither respondent, nor Hurlice L., were able to care for, protect, train, or discipline D.L.

¶ 7    In a permanency order entered on March 21, 2021, the trial court set a goal of returning D.L. home and noted that neither parent was visiting with D.L. It further stated that respondent needed to participate in a substance abuse assessment, drug treatment, and visitation with D.L. to accomplish the stated goal. However, on October 15, 2021, the trial court changed the permanency goal to substitute care pending a determination on termination of parental rights.

¶ 8    On February 24, 2022, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption. That petition alleged the unfitness of respondent as a parent for multiple reasons including: (1) the failure to maintain a reasonable degree of interest, concern, or responsibility as to D.L.'s welfare; (2) desertion of D.L. for more than three months preceding the commencement of termination proceedings; (3) the failure to make reasonable efforts to correct the conditions that led to D.L's. removal or make reasonable progress toward D.L.'s return within 9 months of the adjudication of abuse or neglect; and (4) an evidenced intent to forego parental rights as demonstrated by a failure to visit with, communicate with, or maintain contact with D.L. for a period of 12 months. The petition claimed that D.L.'s foster mother desired to adopt him and that such adoption was in his best interest.

¶ 9    On October 16, 2023, the matter proceeded to a hearing on the issue of parental fitness. Kimberley Agee testified that she was employed by Ada S. McKinley Community Services and she was D.L.'s case worker from August 2019 to March 2023. D.L. was born July 20, 2019, and was taken into custody on August 5, 2019, because he was born substance-exposed, having tested

positive for cocaine. Respondent initially refused to participate in an assessment in 2019 to determine what services would be appropriate for her. Agee recommended that respondent participate in a Juvenile Court Assessment Program (JCAP), drug treatment, and random urine testing, and, if drug treatment was successful, parenting classes and individual therapy. However, Agee was unable to make any referrals to respondent because her whereabouts were unknown until December 2019 when respondent contacted Agee to inform her that she was in custody in the Cook County Department of Corrections. In that phone call from jail, respondent informed Agee that she was in a parenting program in jail called Project Thrive. Agee informed her that upon her release she could begin to participate in the other recommended services and visitation.

¶ 10    Respondent contacted Agee again in February 2020 when she was released from jail to inform her that she had completed Project Thrive and emailed her a certificate of completion. Respondent reported that she had relocated to Wisconsin to live with her sister and provided an address. Agee informed her that she could refer her to services in Illinois for which the State of Illinois would pay, and she could also refer her to services in Wisconsin, but respondent would have to pay for those services herself. During that conversation, respondent did not express any interest in engaging in any services to progress toward reunification with D.L. Respondent also reported that she was pregnant with her second child. Agee was aware that respondent was being monitored by Wisconsin's Child Protective Services, but she never received any documentation that respondent completed any of the recommended services in Wisconsin. Agee offered to arrange visitation of D.L., but respondent informed Agee that she was not able to travel to Illinois due to her pregnancy.

¶ 11    She testified that at no point in 2019 or 2020 did respondent visit D.L. or participate in any of the recommended programming. Respondent ended 2020 with an "unsatisfactory" rating for her service plan. Agee did not recall speaking to respondent once in 2021, and respondent did not have any visitation with D.L. in 2021. In October 2021, the agency changed its recommendation to "substitute care pending termination of parental rights," based upon the fact that the parents' whereabouts were unknown, and they had not engaged in any of the recommended services. Agee was unaware of any time in 2021 where respondent returned to Chicago to engage in the recommended services. By October 2021, respondent's rating for her service plan remained unsatisfactory.

¶ 12    However, respondent reached out to Agee in July of 2022, approximately five months after the State filed its petition to terminate parental rights. At that time, respondent expressed her desire to have D.L. returned to her so he could live with her in Wisconsin. Agee continued to offer respondent visitation. However, by the end of 2022, respondent had not contacted Agee to schedule any visits, and the recommended services remained outstanding.

¶ 13    In February 2023, respondent contacted Agee to schedule a visit with D.L. Agee agreed to facilitate a visit and arrange for transportation to Chicago by train. However, before Agee could arrange transportation, respondent cancelled the visit without providing a reason. Agee's assignment ended in March of 2023, but prior to that point, respondent did not have any visitation with D.L. Overall, Agee stated that during the entire time she was assigned to D.L.'s case, respondent took no steps to reunify with D.L.

¶ 14    On cross-examination by the public guardian, Agee acknowledged that although respondent had no scheduled visits with D.L. during Agee's assignment, respondent did have one

informal visit. D.L.'s foster mother had family near where respondent was living "early on in the case," and D.L. and his foster mother encountered respondent on the street.

¶ 15    During cross-examination by respondent, Agee agreed that respondent was 17 when she gave birth to D.L. and that respondent stated that she ran away from home at 17 because she had been living with her paternal grandfather, who was using drugs, and because she was being physically abused. When D.L. was born, respondent wanted D.L. placed with respondent's sister, but DCFS refused because respondent's sister lived in Wisconsin. Agee testified that she tried to arrange visitation with D.L. after respondent's second child was born, but they could not solidify a date to do so. Agee also admitted that she did not give respondent specific referrals to community-based services in Wisconsin.

¶ 16    On redirect examination, Agee stated that she had no way to confirm respondent's sobriety from 2019 through 2023. She also testified that respondent never asked her to assist her with obtaining services in Wisconsin, even though she offered to do so.

¶ 17    Respondent testified that she was 28 at the time of the hearing, and she was 23 or 24 when the case began. She was incarcerated shortly after D.L. was taken into protective custody, during which time she completed a three-month drug treatment and parenting class. Respondent was released from jail in April of 2020, and she moved to Wisconsin. She did not contact Agee immediately because she did not have Agee's contact information. Once she found Agee's contact information, she called to provide an updated address. Respondent claimed that Agee did not discuss services with her during that phone call, but Agee did tell her that the cost of services outside of Illinois would not be covered. She also claimed that there was a period of time during the pandemic where her access to the relevant services was limited.

¶ 18    Respondent explained that it was not practical for her to travel to Illinois at the time because she was initially unemployed and the only family she had in Illinois was her father, who lived in a one-bedroom apartment. She stated her entire support system was in Wisconsin, where she was living in a five-bedroom house with her mother, stepfather, and her two children, J.C. and N.C., who were two and almost one at the time of the hearing. Since moving to Wisconsin, respondent obtained her high school diploma and found full-time employment as a home health care worker. Neither of her two other children were involved with the courts in Wisconsin and respondent claimed they were doing well.

¶ 19    Respondent claimed that she signed up for a drug treatment course in March or April of 2023, and that it was ongoing at the time of the hearing. She acknowledged not having completed any additional services, though she testified she had begun receiving therapy.

¶ 20    When asked about her lack of visitation with D.L., respondent explained that in 2020 she was pregnant and was afraid to travel due to the COVID-19 pandemic. Her pregnancy with D.L. was marked by multiple complications, as she suffered from preeclampsia and she stated that the umbilical cord nearly wrapped around D.L.'s neck in the womb. She claimed that her second pregnancy was likewise "difficult," though she did not elaborate. In 2021, after she had her second child, J.C., she was occupied trying to find a job and a place to live while also caring for a newborn. Respondent then became pregnant with her third child, N.C., and she testified that she had additional complications with her third pregnancy, but she did not inform Agee about them. Instead, she only told Agee that she could not travel while pregnant.

¶ 21    Respondent claimed that Agee never offered her virtual visits or telephone calls with D.L., but she did have some conversations with D.L. over the phone through his foster mother, Ashley

M. Respondent stated she had more than one such call with D.L., but when asked if she had "a number of calls" with D.L. she responded, "Not multiple; no."

¶ 22    Respondent then described an incident where she planned to visit D.L. and Ashley M. "told [respondent] she would bring [D.L.] around," but Ashley M. never called respondent, leaving respondent at her father's house with gifts she bought for D.L.

¶ 23    Between July of 2021 and July of 2022, respondent found that her number was blocked when she tried to call Ashley M. Respondent reached out to Ashley M. via Facebook to connect with her and see D.L., but sometimes Ashley M. would not respond. She claimed that in-person visits were not reinstated until 2023 when Agee's assignment ended and a new caseworker, Devon Reed, took over. Respondent stated she had visits in August and September of 2023 and had another scheduled for the week following the hearing.

¶ 24    The State called Ashley M. in rebuttal, who testified that D.L. has been in her custody since he was ten days old. Ashley M. met respondent at that time, gave respondent her phone number, and told respondent to call whenever she wanted to have contact with D.L. Respondent also located Ashley M.'s Facebook account and contacted her there.

¶ 25    She described her contact with respondent as "on and off," with the longest period of no contact being 10 or 11 months between 2021 and 2022. When respondent did contact her, she would ask Ashley M. to send a picture or ask for a time to call when D.L. would be available. Eventually, Ashley M. told respondent to call any time before 8 p.m. Respondent did not abide by this request and would at times call later in the evening. Ashley M. also noted that respondent's communication would sometimes coincide with upcoming court dates.

¶ 26 Ashley M. also facilitated occasional video calls between respondent and D.L., although she estimated this only occurred three times since 2019. As for in-person visits, respondent once asked Ashley to bring D.L. to Wisconsin, but Ashley M. declined. On another occasion, respondent told Ashley M. she would be in Chicago and wanted to arrange a visit. The two discussed a time for the visit and agreed that respondent would contact her once she was in Chicago. However, Ashley M. never heard from respondent on that day.

¶ 27 Ashley M. could not remember any time that respondent sent birthday gifts to D.L., but she did recall a 2022 visit where respondent went to Chuck E. Cheese's with D.L. and got him a gift.[3] She said respondent had not seen D.L. since March of 2023. She also said that respondent had not reached out in the previous two months to inquire as to D.L.'s wellbeing. Furthermore, she testified that D.L., who was almost five years old at the time of the hearing, did not ask about respondent during the times when respondent was not reaching out and had not asked about respondent since his last visit in March of 2023.

¶ 28 During the summer of 2023, respondent began calling Ashley M. at 10 or 11 p.m. and continued doing so despite Ashley M.'s request that respondent stop. Ashley then blocked respondent on Facebook.

¶ 29 On cross-examination by the public guardian, Ashley M. stated that respondent had sent a gift for only one of D.L.'s birthdays and that she did not otherwise send cards or Christmas gifts. Ashley M. also stated that there had never been any occasions where respondent had a scheduled

---

[3]Although Ashley M.'s testimony stated this visit took place in 2022, respondent's own testimony indicated this visit took place in August or September of 2023.

visit and Ashley M. did not follow through facilitating it. She also clarified that she only blocked respondent on social media and never blocked respondent's cell phone number.

¶ 30    On cross-examination by respondent, Ashley M. stated she was unaware of respondent's pregnancy complications that made travel difficult and that respondent never told her about them.

¶ 31    The State offered nine exhibits into evidence to which respondent did not object. These consisted primarily of DCFS family service plans, the contents of which were largely duplicative of the hearing testimony. However, they did contain several noteworthy facts. People's Exhibit #7, a DCFS family service plan dated August 18, 2021, documented that respondent reached out to a mutual friend through Facebook to arrange a virtual visit with D.L., but D.L. "wasn't familiar with her and refused to engage with her." People's Exhibit #9, a DCFS family service plan dated August 14, 2022, noted that respondent became angry when she was informed that DCFS would provide bus or train transportation for respondent to travel to visit D.L., but would not bring D.L. to Wisconsin. Following the testimony and admission of exhibits, the hearing was continued for a ruling.

¶ 32    On July 19, 2024, respondent did not appear in court, and the trial court delivered its ruling on respondent's unfitness without her. Summarizing the evidence, the trial court found that respondent had not completed any of the recommended services other than a parenting course while incarcerated. It also found that respondent had no visits with D.L. in 2020 or 2021, and that respondent had no contact with her case worker in 2021. The trial court further noted that, even if respondent could not travel due to her pregnancies, it did not excuse her lack of contact with her caseworker, her lack of requests for virtual visits, or lack of letters or gifts for her son. Regarding respondent's testimony that she participated in drug treatment, the trial court noted the lack of any

documentary evidence for that and did not find respondent's testimony credible. The trial court also doubted respondent's testimony that she brought a gift to Chicago for the in-person visit which never transpired. It reasoned that respondent would have notified DCFS that she had a gift to pass along to D.L.

¶ 33 The trial court found that the State met its burden of proof as to respondent's lack of interest, concern, and responsibility. It noted that respondent moved out of Illinois while D.L. was in the custody and care of DCFS, failed to engage in the recommended services, had "half-hearted, sporadic contact with [DCFS] concerning her son," and went a period of three years without any visits with D.L. The trial court believed Agee could have done more to contact respondent, but that ultimately it was respondent's responsibility to maintain a reasonable degree of interest, concern, and responsibility.

¶ 34 The trial court also found that the State met its burden of proof as to whether respondent deserted D.L., noting that "[t]hree months prior to the TPR, natural mother's exact whereabouts was [*sic*] unknown and she had no contact with the agency or the minor."

¶ 35 Next, the trial court found the State's burden of proof was met as to the lack of respondent's reasonable effort and progress, noting that respondent completed only one of the recommended services, which was done while incarcerated, for all of the nine-month periods alleged. The trial court reiterated that it was not crediting respondent's testimony that she had completed a drug treatment program.

¶ 36 Finally, the trial court found the State had proven respondent's intent to forego parental rights as demonstrated by her failure to visit D.L. for a period of 12 months. The trial court also found Hurlice L. unfit on all the same grounds.

¶ 37    The parties then proceeded to a hearing to determine the outcome that was in D.L.'s best interest. Reed testified that he was employed by Ada S. McKinley Community Services and that he had been D.L.'s caseworker since April of 2023. Having had an opportunity to observe Ashley M. with D.L., he stated that Ashley M. was a loving, caring mother and that D.L. referred to her as "mom." According to Reed, D.L. was incorporated into the household, called Ashley M.'s boyfriend "dad," and got along well with Ashley M.'s daughter. He described Ashley M. as diligent in making sure D.L. attended doctor visits and daycare. He stated the home environment was nurturing and believed D.L. was happy and that D.L. wished to remain there. It was his opinion that respondent's parental rights should be terminated and that the best thing for D.L. would be to have DCFS appointed as D.L.'s guardian with the right to consent to his adoption.

¶ 38    Ashley M. testified that she desired to adopt D.L. and that he has brought her nothing but joy since he came into her life. She stated her commitment to providing permanency for him going forward. On cross-examination by respondent, Ashley M. stated she did not intend to allow D.L. any contact with his biological siblings in Wisconsin or respondent. She explained that D.L. has no relationship with his siblings and she did not know what type of situation those meetings would be. She also would not want him to be confused by spending time with his biological mother.

¶ 39    The State introduced into evidence a document titled "Permanency commitment by foster parent/relative caregiver," signed by Ashley M. which stated her intention and desire to adopt D.L.

¶ 40    The trial court ruled that it was in D.L.'s best interest to terminate respondent's parental rights and appoint DCFS as guardian with the right to consent to D.L.'s adoption.

¶ 41    Respondent filed a notice of appeal on August 9, 2024.

¶ 42                                  II. ANALYSIS

¶ 43     In Illinois, the trial court's power to terminate parental rights involuntarily is derived from the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.*) (West 2022)) and the Adoption Act (750 ILCS 50/1 *et seq.*) (West 2022)).

¶ 44     A petition to terminate parental rights is filed pursuant to section 2-29 of the Juvenile Court Act. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). That section delineates a two-step process in seeking termination of parental rights involuntarily. *In re J.L.*, 236 Ill. 2d at 337; 705 ILCS 405/2-29(2) (West 2022). First, the trial court must find, by clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act. *In re J.L.*, 236 Ill. 2d at 337; 705 ILCS 405/2-29(2), (4) (West 2022); 750 ILCS 50/1(D) (West 2022). Second, once a finding of parental unfitness is made under section 1(D) of the Adoption Act, the court considers the "best interest" of the child in determining whether parental rights should be terminated. *In re J.L.*, 236 Ill. 2d at 337-38; 705 ILCS 405/2-29(2) (West 2022).

¶ 45     The Adoption Act defines an "unfit person" as "any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption." 750 ILCS 50/1(D) (West 2022). The Adoption Act further supplies numerous grounds upon which the trial court may base its finding that a parent is unfit. For the purposes of this case, the State alleged four different grounds under which respondent was unfit: (1) respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) respondent deserted the child for more than three months preceding the commencement of the termination proceedings (750 ILCS 50/1(D)(c) (West 2022)); (3) respondent failed to make reasonable efforts to correct the conditions which were the basis for the

removal of the child and/or failed to make reasonable progress toward the return of the child within 9 months of the adjudication of neglect or abuse (750 ILCS 50/1(D)(m) (West 2022)); and (4) respondent evidenced an intent to forego parental rights as manifested by a failure for a period of 12 months to visit D.L., communicate with D.L. or the agency, although able to do so, and/or maintain contact with or plan for D.L.'s future, although able to do so (750 ILCS 50/1(D)(n) (West 2022)).

¶ 46    Defendant argues that the State failed to prove all four of these grounds by clear and convincing evidence. Alternatively, she argues that the trial court erred in finding that D.L.'s best interests warranted termination of her parental rights and the appointment of a guardian. We address these issues in turn. However, before reaching the issues raised by respondent, we must first address the timeliness of our decision.

¶ 47                            A. Timeliness of this Order

¶ 48    The matter at bar is subject to an expedited disposition pursuant to Illinois Supreme Court Rule 311(a). Ill. S. Ct. R. 311(a) (eff. Mar. 8, 2016). Subsection (a)(5) of Rule 311 requires us to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R. 311(a)(5). The trial court's final judgment was entered on July 19, 2024. Respondent's notice of appeal was filed on August 9, 2024. This means we would have ordinarily been required to issue our decision by January 6, 2025.

¶ 49    The record on appeal in this case was not filed until October 15, 2024. Respondent requested and was allowed two extensions of the time to file her appellant's brief, which was filed on November 27, 2024. The Public Guardian subsequently requested two extensions of time and the State requested three extensions of time to file their appellees' briefs, with those being filed on

February 5. 2025, and February 6, 2025, respectively. Respondent filed her reply brief on February 13, 2025.

¶ 50    Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

¶ 51                              B. Parental Unfitness

¶ 52    We next address respondent's claim that the State failed to prove that respondent is an unfit mother. The State bears the burden to prove a respondent's unfitness by clear and convincing evidence. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). We afford great deference to a trial court's finding of unfitness because the trial court is in the best position to view and evaluate the parties and their testimony, and thus we will not reverse unless the trial court's finding was against the manifest weight of the evidence. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 46. A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record. *Id*.

¶ 53    "Each case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." *Id*. (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Because a trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act, *Je. A.*, 2019 IL App (1st) 190467, ¶ 47, and given our disposition, we need only address one of the four grounds challenged by respondent.

¶ 54    Thus, we begin by analyzing the first ground upon which the trial court based its finding of unfitness, respondent's failure to maintain a reasonable degree of interest, concern, or responsibility.

¶ 55    Ground (b) has no time constraint that limits a court's consideration of a parent's fitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 50. Moreover, ground (b) does not focus on a parent's success but, rather, the reasonableness of her efforts and takes into account the parent's difficulties and circumstances. *Id*. "However, our courts have repeatedly concluded that a parent is not fit merely because [she] demonstrated some interest or affection toward [her] child; rather [her] interest, concern, and responsibility must be reasonable." *Id*. (quoting *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). "Noncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b)." *In re Jaron Z.*, 348 Ill. App. 3d at 259. Incarceration and delay in inquiring about the wellbeing of a child can also support a finding of unfitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 55 (a single letter, sent three months after the parent became incarcerated, did not show a reasonable degree of concern).

¶ 56    Failure to maintain a reasonable degree of interest, concern, or responsibility includes all situations where a parent's attempts to do so are inadequate whether the inadequacy results from an unwillingness or an inability to comply. *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 26. The language of section 1(D)(b) is disjunctive, and therefore any of the three elements may be considered on its own as a sufficient basis for unfitness. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 49.

¶ 57    The trial court did not err when it found that the State proved by clear and convincing evidence that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to D.L.'s welfare. 750 ILCS 50/1(D)(b) (West 2022). There is ample evidence to support the trial court's decision.

¶ 58    Respondent urges us to consider the entire period between respondent's loss of custody and the termination hearing. But this is clearly what the trial court already did, not allowing respondent's slight uptick in interest after the commencement of termination proceedings to overshadow multiple years of little to no interest, concern, or responsibility.

¶ 59    The testimony established that, from the start of DCFS's involvement in respondent's case, respondent refused to participate in an initial assessment to determine the most appropriate services for her. Agee nevertheless recommended that respondent engage in JCAP, drug treatment, and submit to random urine testing. If those were successful, her additional recommendations were that respondent participate in parenting classes and individual therapy. However, the trial court found that the only service respondent ever completed was a parenting class during her incarceration. While respondent argues that her testimony showed that she completed a drug treatment course while incarcerated and enrolled in another several months prior to the hearing, the trial court did not credit this testimony because respondent provided no documentation to DCFS to corroborate it. Indeed, because respondent never participated in any urine analysis as recommended, Agee had no evidence that respondent maintained her sobriety while this case was pending. Nor did Agee ever receive any evidence that respondent had completed any of the recommended services in Wisconsin. Throughout the pendency of this case, respondent's rating for her service plan remained unsatisfactory. And though respondent claims some of the blame lies with Agee for not more proactively making referrals, even where a caseworker could have been more effective, the ultimate responsibility for maintaining a reasonable degree of interest, concern, or responsibility rests with the parent. *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008).

Nothing about Agee's performance of her job prevented respondent from demonstrating reasonable interest, concern, or responsibility.

¶ 60    Respondent's testimony tried to explain her lack of concern, interest, and responsibility as the product of both her second and third pregnancies, which suffered from multiple complications, and her responsibilities raising her two other children in another state. Where visits are impractical, courts should still consider whether respondent demonstrated a reasonable degree of concern through letters, telephone calls, and gifts, taking into account the nature and frequency of those contacts. *In re Konstantinos H.*, 387 Ill. App. 3d at 204. Thus, respondent also urges us to consider her efforts to communicate and show interest, not the results.

¶ 61    But as the trial court observed, respondent's difficulties and responsibilities did not prevent her from remaining in contact with a caseworker, sending letters, cards, or gifts, or requesting virtual visits through her caseworker. Instead, respondent's communication was sporadic at the best of times and nonexistent at others. Agee testified, for example, that she had no contact with respondent during 2021, and respondent did not reach out until July 2022, after the State filed its petition to terminate parental rights. Furthermore, respondent went three years without any formal visitation and, in that time, her contact with D.L. by way of cards, gifts, or letters was virtually nonexistent. Respondent insists that she was having contact with D.L. through Facebook, and while Ashley M. acknowledged facilitating occasional video calls, she estimated this happened no more than three times since 2019, and that D.L. did not ask about respondent in between these communications. Moreover, the trial court did not credit respondent's testimony about attempting to bring a gift along to Chicago, leaving only one occasion since 2019 where respondent gave D.L. a gift.

¶ 62    In summary, respondent failed to engage in the vast majority of services recommended to her as a path for reunification. She maintained only sporadic contact with her caseworker. She did not engage in any formal visitation with D.L. until the State sought to terminate her parental rights, and sent no letters or cards, and only one gift. And her otherwise informal communication with D.L. was so *de minimis* that it appears D.L. had no real relationship with respondent. Even after the State sought to terminate respondent's parental rights, the record shows that respondent engaged in no more than a couple of in-person visits and she still never completed the services that had been recommended for her.

¶ 63    At the time of the hearing, D.L. was nearly five years old, and he had no more than a handful of virtual or in-person interactions with respondent—and there was no testimony that respondent was routinely attempting to schedule other contacts that never came to fruition. All the while, respondent failed to engage in the course of action that had been recommended to her as a path to reunification. The record shows that respondent failed to maintain a reasonable level of interest, concern, and responsibility. Based on this, the trial court's finding was not against the manifest weight of the evidence.

¶ 64                                  C. Best Interests

¶ 65    After the trial court makes a finding of unfitness, it next considers whether it is in the child's best interests to terminate parental rights. *In re Jaron Z.*, 348 Ill. App. 3d at 261. Once a parent has been found unfit, "the parent's rights must yield to the best interests of the child." *In re M.W.*, 2019 IL App (1st) 191002, ¶ 59. The State must prove by a preponderance of the evidence whether termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill. 2d 347, 366

(2004). The trial court's determination will not be reversed unless it is against the manifest weight of the evidence. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 61.

¶ 66 The Juvenile Court Act sets out ten factors the trial court should consider when determining a child's best interests: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 67 "Additionally, the court may consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon [his] emotional and psychological wellbeing." *In re M.W.*, 2019 IL App (1st) 191002, ¶ 61. The trial court's best interest determination need not contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision. *Id*. Furthermore, no one factor is dispositive and "[c]ourts must remain ever mindful that 'the overriding purpose of the [Juvenile Court] Act to which all other goals are subordinate is the best interest of the child involved.' " *In re Austin W.*, 214 Ill. 2d 31, 50 (2005) (overruled on other grounds) (quoting *In re J.L.*, 308 Ill. App. 3d 859, 865 (1999)). Evidence of a parent's unfitness at a prior hearing is a relevant, if not crucial, consideration when determining the best interest of a child. *In re D.L.*, 326 Ill. App. 3d 262, 271 (2001).

¶ 68    Taking the evidence at the unfitness stage along with the testimony at the disposition hearing, the trial court was presented with a stark picture. On one hand, there was respondent who had shown minimal interest or concern for D.L. over the course of his life and who had repeatedly neglected to take the steps necessary to move toward reunification. This was contrasted with the testimony at the disposition hearing that D.L. spent his whole life in a happy, healthy, secure, loving, and supportive home provided by Ashley M. where his needs were being met and where he appeared to be thriving.

¶ 69    Respondent contends that evidence of a strong bond between the minor and his original family weighs against termination of parental rights. The problem with respondent's argument is, of course, that nothing in the record before us demonstrates that D.L. has much of a bond at all with respondent, let alone a strong one. D.L. refers to Ashley M. and her boyfriend as "mom" and "dad," and the evidence at the unfitness hearing demonstrated that D.L. did not inquire about respondent outside of their limited communication. Moreover, one of the DCFS family service plans noted that during a Facebook communication, D.L. refused to engage with respondent because he was not familiar with her.

¶ 70    The trial court rightly recognized that Ashley M.'s care and love is all D.L. has ever known, and that there was no relationship with respondent to preserve—precisely because of respondent's actions or inaction. Indeed, respondent did not even appear at the disposition hearing, nor was her absence explained. The trial court also rightly identified that D.L.'s entire sense of security, familiarity, and value came from his foster parent, who he had been with since he was 10 days old. Ashley M. had been responsible for virtually everything in D.L.'s life: his food, his clothing, his health, his home, and his family. Meanwhile, respondent had been responsible for none of that. In

this regard, the trial court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 71    Respondent also argues that the trial court's determination was in error because Ashley M. stated she does not intend to allow D.L. to have any contact with respondent's two other children. She cites to the Children and Family Services Act which states that "sibling relationships are unique and essential for a person, but even more so for children who are removed from the care of their families and placed in the State child welfare system. When family separation occurs through State intervention, every effort must be made to preserve, support, and nurture sibling relationships when doing so is in each child's best interest." 20 ILCS 505/7.4(a) (West 2022).

¶ 72    We note that this statute is not an absolute command, and that it is premised on what is in the child's best interest. There was no evidence that D.L. has any relationship to respondent's other children who live in another state, or that he has ever had any interaction with them whatsoever. This was not an instance where there was a relationship to preserve or nurture. There was no continuity of relationships with D.L.'s siblings to maintain. But more importantly, no single factor is dispositive. Even if we were to agree that Ashley M.'s decision not to allow D.L. contact with his siblings was misplaced, the remaining factors all weigh heavily in favor of termination of parental rights. Ashley M. desired to adopt D.L., and Ashley M.'s care and affection was all he had ever known. He referred to her as "mom," because, of course, that is what she has been to him his entire life. The record in this case demonstrates that the decision to terminate respondent's parental rights and give Ashley M. the opportunity to become in title what she already was in spirit was clearly in D.L.'s best interest.

¶ 73    Accordingly, the trial court's decision was not against the manifest weight of the evidence.

¶ 74                                    III. CONCLUSION

¶ 75     For the above reasons, we affirm the trial court's judgment which found respondent unfit, terminated her parental rights, and appointed a guardian with the right to consent to adoption.

¶ 76     Affirmed.