NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250389-U

NO. 4-25-0389

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 2, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 23JA145 |
| v. | ) | |
| Demarious B., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

_____

JUSTICE VANCIL delivered the judgment of the court.
Justices Steigmann and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed, concluding no issues of arguable merit could be raised on appeal.

¶ 2    In December 2024, the State petitioned to terminate the parental rights of respondent, Demarious B., as to his minor child, K.K., who was born on April 30, 2023. The trial court granted the State's petition. Respondent appealed. His appointed attorney moves to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), claiming respondent's appeal presents no potentially meritorious issues. Respondent filed no response to counsel's motion. We grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4    On August 9, 2023, the Illinois Department of Children and Family Services (DCFS) filed a shelter care petition on behalf of then-three-month-old K.K. The petition named

respondent, then 16 years old, as K.K.'s putative father. The petition alleged that in May 2023, DCFS received a report that respondent choked K.K.'s mother, Jahnice K., while she was holding K.K. According to a DCFS investigator, Jahnice reported that respondent smacked her in the head while she was holding K.K. and talking to her brother on the phone. Her father called the police. Jahnice claimed that respondent asked, " '[W]hy'd you snitch on me,' " and he began choking her. Respondent was charged with aggravated domestic battery, aggravated assault to a police officer, resisting a police officer, and possession of cannabis. On August 8, 2023, DCFS received another report that K.K. and Jahnice, herself a minor, were in a home without either air conditioning or adequate supervision. An investigator spoke to Jahnice, who said that she and respondent were continuing their relationship and planned to move to Mississippi. The petition further alleged that respondent was also adjudicated a dependent minor. He had prior delinquency adjudications for theft, harassment by electronic communication, and violation of an order of protection. Finally, the petition alleged that K.K. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) and asked that he be named a ward of the court and placed in shelter care.

¶ 5        After a hearing on August 10, 2023, the trial court entered a temporary custody order. Respondent appeared at the hearing via Zoom, and the court ordered him to submit to DNA testing. Over the next few months, respondent failed to appear at multiple hearings, and the court found him in default. Respondent also failed to complete the DNA testing.

¶ 6        On November 29, 2023, Samantha Galyean, a Children's Home caseworker, filed a dispositional hearing report, stating that respondent had removed his court-ordered ankle monitor and gone "on the run," but he was apprehended and being held in a detention facility. According to the report, despite an active no contact order prohibiting him from contacting Jahnice or K.K.,

respondent continued to communicate with Jahnice. Respondent had been found guilty of domestic battery and aggravated assault earlier that month. The report also included the results of a DNA test confirming that respondent was K.K.'s father. In January 2024, an addendum to the report noted that respondent would be transferred to Bledsoe Youth Academy in Gallatin, Tennessee.

¶ 7 On February 1, 2024, the trial court adjudicated K.K. neglected. See *id.* The court also found respondent unfit based on the petition and report. It ordered respondent to complete certain tasks, including: execute all authorizations requested by DCFS to monitor respondent's compliance with the court's order and the minor's needs; cooperate with DCFS; obtain and maintain stable, safe housing; provide certain information to DCFS; complete a substance abuse assessment and any recommended treatment, parenting classes, counseling, and a domestic violence class; and submit to random drug and alcohol testing.

¶ 8 On December 4, 2024, the State filed a petition to terminate respondent's and Jahnice's parental rights. The State alleged that respondent was unfit based on his failure to make reasonable progress toward the return of a minor to his care within nine months after the adjudication of neglect on February 1, 2024 (750 ILCS 50/1(D)(m)(ii) (West 2024)), and maintain a reasonable degree of interest, concern, or responsibility as to K.K.'s welfare (*id.* § 1(D)(b)).

¶ 9 On January 9, 2025, Jahnice executed a final and irrevocable surrender, granting DCFS the right to consent to K.K.'s adoption.

¶ 10 On February 6, 2025, the trial court found respondent in default, and it set the case for a hearing on the petition to terminate parental rights and the minor's best interests. Respondent filed an answer, denying the allegations in the State's petition. The court vacated its order defaulting respondent.

¶ 11 On March 24, 2025, the trial court held a hearing on the State's petition to terminate

parental rights. Galyean testified she was a caseworker at Children's Home. She stated that K.K.'s case had started because of a domestic violence incident involving respondent and K.K.'s mother. Respondent was ordered to complete counselling, a substance abuse evaluation, drug tests, parenting education, and domestic violence education. Respondent was placed at a facility named Bledsoe Academy in Tennessee. While he was there, Galyean spoke with him about completing those services. She testified that he could have completed most of his services while he was there. They also discussed lifting the no contact order regarding Jahnice and K.K. if he engaged in some of his services. Respondent did not ask about K.K. when they spoke.

¶ 12        According to Galyean, respondent was removed from the Tennessee facility and sent to Le Penseur Youth & Family Services (Le Penseur), a shelter in Chicago, Illinois, after he assaulted a staff member. While respondent was in Chicago, Galyean spoke to his counselor and confirmed that services were available there. She also referred respondent for parenting education classes. The no contact order with K.K. was removed on March 4, 2024, and Galyean spoke with respondent's counselor about arranging visits with K.K. However, respondent repeatedly ran away from Le Penseur, and on or about June 20, 2024, he was "completely removed." Galyean stated that respondent "brought a female into the facility," and he "allegedly assaulted her."

¶ 13        Galyean testified that respondent was taken to his aunt's home in Peoria, Illinois. She spoke to respondent on July 18, 2024, and set a meeting with him on the following day. When they talked on the phone, he did not ask about K.K. Respondent did not attend the meeting. They rescheduled the meeting, and he missed the rescheduled meeting as well. Mindy Fischer, respondent's casework in his juvenile delinquency and juvenile abuse cases, informed Galyean that respondent had left his aunt's house. In August 2024, the Tazewell County jail informed Galyean that they had detained respondent. Fischer then brought respondent to his adoptive

father's residence.

¶ 14    Galyean did not hear from respondent again until the end of October 2024. Respondent told her he was in Mississippi with his mother. They tried to schedule a virtual meeting, but respondent did not show up. They rescheduled, and respondent attended the rescheduled virtual meeting. Galyean asked him to look for service providers in Mississippi. They spoke again in December and January, when respondent had returned to Illinois. Respondent did not ask about K.K. when they spoke. Galyean testified that respondent had no visits with K.K., provided no cards, letters, or gifts for K.K., and did not complete any of the court-ordered services. She testified that she made visits available to him, including virtual visits.

¶ 15    On cross-examination, Gaylean admitted that she was going to refer respondent for services in Tennessee, but she was unable to. She admitted that she declined to submit a referral for virtual domestic violence classes because, considering respondent's history of violence, she thought he needed an in-person class. Respondent's moving between different facilities made it more difficult to arrange services.

¶ 16    Fischer testified that she worked with Galyean to coordinate services for respondent. She explained that Bledsoe Academy had been working with her to start services for respondent. Substance abuse assessments, counseling, and domestic violence classes were available. They were also working on arranging a parenting class and drug screens. She testified that respondent was discharged from Bledsoe Academy for assaulting a staff member, and she brought him to Le Penseur in Chicago. According to Fischer, she tried to set up services for respondent, but he "either wouldn't attend them or before he could complete them, he was also discharged from Le Penseur." She explained that Le Penseur discharged him because of "several altercations in the facility and then the final being they accused him of bringing a woman into the

facility and assaulting her." When asked if she tried to determine why respondent would not attend services, she answered:

> "Lot of times he would leave the facility in the mornings and be on run, but not gone long enough for run protocol. So if he's in that 24-hour window, we don't do run protocol. But he wouldn't come back, so we didn't know where he was and he wasn't going to the services."

¶ 17 Fischer claimed that she had several conversations with respondent about his services. She testified, "He always voiced that he wanted to do the services and that he wanted to get engaged, but as soon as they were being offered, he would fail to attend, fail to go. At one point, [he] even made mention he would do services if we would compensate him." She confirmed that respondent completed no services at either Bledsoe Academy or Le Penseur, even though services were available. According to Fischer, respondent occasionally asked her about seeing K.K., and Fischer told him that she did not know anything about K.K.'s placement or status and that respondent would have to speak with Galyean for information about K.K.

¶ 18 Respondent testified that he asked Galyean and Fischer about K.K. almost every time he was in contact with them. He testified that he started counseling at Le Penseur, but the counselor told him that he did not think he needed counseling and he closed respondent's case. He did not begin any other services. Later, "transportation issues" prevented him from completing services. On cross-examination, respondent was asked if he asked Galyean about K.K. He answered that he did not talk to Galyean "regularly," adding, "[D]ue to the situations that occurred in each—each setting, they—I wasn't able, really, to do anything." He clarified that he was referring to "violence" at the facilities. Over counsel's objection, the trial court allowed respondent to testify that he punched a staff member in the lip after the staff member pushed him. He also

testified that at Le Penseur, he fought with other youth there, a staff member "put his hands on" him, and respondent "fought back." When asked if he sent K.K. any cards or letters, he answered that, during his approximately two-week stay at Bledsoe Academy, he made cards, but he did not know if K.K. received them. He admitted that he did not send any other cards, letters, or gifts outside of that short period of time.

¶ 19 The trial court found that the State proved both counts by clear and convincing evidence. The court found that Galyean and Fischer tried to provide opportunities for respondent to complete services, but respondent "failed to adequately address the reason the case came into care." The court found it "abundantly clear" that there was not demonstrable movement toward reunification during the specified nine-month period. Respondent continued to have unstable housing and issues with aggression and domestic violence, and he made only "halfhearted" attempts to connect with K.K. The court also found that respondent failed to maintain a reasonable degree of interest, noting especially that respondent had multiple opportunities to visit with K.K., including remote visits, but he never did. The court found "zero evidence" that respondent "show[ed] up" for K.K., either "physically" or "emotionally."

¶ 20 The trial court then held a hearing on K.K.'s best interests. Galyean prepared a report recommending that K.K. be adopted by his foster family. K.K. had resided with them since November 2023, he was "very bonded" with his foster mother and foster father, and his needs were being met. The report recommended adoption.

¶ 21 Galyean testified that she had visited K.K.'s foster parents' home once per month since November 2023. She testified that K.K. was "very attached" to his foster parents and he "[a]lways wants [to be] picked up, hugged, cuddled." The home was clean, K.K. had his own room, he had toys, and his needs were being met. His speech development was slightly delayed, but the

foster mother was learning sign language, and they were on a waitlist to begin speech services. He also received occupational therapy. She testified that K.K. was also very bonded to the other two young children in the house. She reiterated that she received no cards, letters, gifts, or communication from respondent for K.K. She believed that remaining with the foster family was in K.K.'s best interests.

¶ 22    Katie O., K.K.'s foster mother, testified that K.K. had been in her care since November 2023. She also had two daughters, ages six and five. She testified that K.K. showed love and affection to her, her husband, and their daughters. Katie's parents lived nearby. They were K.K.'s "primary baby-sitters," and K.K. was also bonded with them. K.K. had his own room. Katie explained that K.K. had a speech delay and "some sensory needs." He was receiving occupational therapy twice per month, and he was on a waitlist for speech therapy. They took K.K. to a church, where they had "community ties."

¶ 23    K.K.'s guardian *ad litem* (GAL), Debbie Harper, testified that K.K.'s foster parents did an "amazing job." They provided anything K.K. needed, including a stable home, extended family, and community. He was "happy" and "thriving." She believed that his foster parents' home was the best placement for him.

¶ 24    After noting that it considered all the statutory best-interests factors, the trial court found, "[A]lmost every single one I look at favors termination of the parental rights of both Jahnice [K.] and [respondent]." The court explained that K.K. came into care because of domestic violence, which respondent had not addressed. K.K. was safe and healthy with his foster family, where he developed community connections. Returning K.K. to respondent would "negatively disrupt his development," especially considering the instability in respondent's life. The court found that termination of parental rights was in K.K.'s best interests.

¶ 25	This appeal followed.

¶ 26	II. ANALYSIS

¶ 27	Respondent's attorney moves to withdraw, claiming the case presents no potentially meritorious grounds for appeal. She filed a memorandum of law with a statement of facts, a discussion of potential claims, and an explanation of why those potential claims lack merit. Counsel sent her motion and accompanying memorandum to respondent by e-mail. Respondent was advised he had until June 30, 2025, to respond to counsel's motion. Respondent filed no response.

¶ 28	Section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)) establishes a two-step process for involuntary terminations of parental rights. First, the State must prove by clear and convincing evidence that a parent is "unfit." See 750 ILCS 50/1(D) (West 2024); see also *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). Second, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 29	The trial court found that the State established respondent's unfitness on two grounds. First, the court found respondent failed "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" means "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211 (2001). This is an "objective standard." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 30	Second, the trial court found that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to K.K.'s welfare. See 750 ILCS 5/1(D)(b) (West 2024).

"In examining allegations under subsection (b), a trial court must focus on a parent's reasonable efforts rather than her success, and must consider any circumstances that may have made it difficult for her to visit, communicate with, or otherwise show interest in her child." *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008). "If personal visits were somehow impractical, courts consider whether a reasonable degree of concern was demonstrated through letters, telephone calls, and gifts to the child, taking into account the frequency and nature of those contacts." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). On review, we will not reverse a trial court's finding of unfitness unless it was against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29.

¶ 31    Counsel contends that there are no potentially meritorious challenges to the trial court's fitness determination. In evaluating potential arguments, she considered arguing that respondent made reasonable progress by attending counseling and drawing pictures for K.K., despite the difficulties he faced moving around and being a youth in care himself. But counsel concluded that it was implausible that we would find the trial court's decision was against the manifest weight of the evidence based on this testimony.

¶ 32    Counsel is correct. Respondent made practically no progress on addressing the reasons K.K. came into DCFS' care. He did not complete domestic violence education. Bledsoe Academy and Le Penseur both discharged respondent because of violent incidents. Respondent did not complete parenting classes, and he failed to maintain any stability in his own living situation. He certainly did not establish a stable home for K.K. Even if respondent's unstable living arrangements posed additional hurdles to completing his services, the trial court could reasonably have concluded that respondent's difficult living situations were caused by his own conduct, beginning with his convictions for domestic battery and aggravated assault and continuing with

his flights, alleged assault of an employee of the Tennessee facility, and removal to Chicago. If the trial court found that respondent's living situation was not an excuse, we certainly would not find this to be against the manifest weight of the evidence.

¶ 33    Similarly, we would reject any challenge to the trial court's conclusion that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to K.K.'s welfare. Galyean testified that, when she was able to contact respondent, he rarely asked about K.K. Although a no contact order initially prohibited him from communicating with or seeing K.K., that order was lifted, and Galyean tried to make virtual visits available to respondent. Nevertheless, respondent did not see K.K. at all throughout these proceedings, nor did he send K.K. any communications. Based on this evidence, we see no basis to reverse the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to K.K.'s welfare.

¶ 34    After concluding that a respondent is unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interests. *Id.* at 366. The court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05)(a)-(j) (West 2024)), including:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and

religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."

On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 35        Counsel states that she found no potentially meritorious challenges to the trial court's best-interests determination. She considered arguing that respondent had recently begun to engage with services before the best-interests hearing and perhaps K.K.'s best interests would be

served by allowing respondent to move forward with these services, with the goal of reunification. However, counsel notes respondent's previous failures to engage with services, unstable living situation, and lack of any employment. Counsel does not find any plausible argument that the court's decision was against the manifest weight of the evidence.

¶ 36 We agree with counsel. Both Galyean and K.K.'s GAL determined that placement with K.K.'s foster family was in K.K.'s best interests. They testified that K.K. was bonded to this family, including the two young daughters. They also testified K.K.'s foster family met all his needs. He had his own room, was receiving occupational therapy, and was on a waitlist to begin receiving speech therapy. Respondent did not testify at all during the best-interests hearing, and he introduced no other evidence to challenge the State's case. Respondent's purported willingness to begin services after over one and a half years without seeing K.K. is not enough for us to reverse the trial court's decisions. Indeed, respondent had no contact with K.K. during this time. Moreover, respondent did not demonstrate any capacity to provide a safe, stable home for K.K. The court's decision was not contrary to the manifest weight of the evidence.

¶ 37 After reviewing the record, counsel's motion, and her memorandum of law, we agree with counsel that this case presents no issue of arguable merit. We grant counsel's motion to withdraw, and we affirm the trial court's judgment.

¶ 38 III. CONCLUSION

¶ 39 For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 40 Affirmed.